(Slip Opinion) OCTOBER TERM, 2018 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## VIRGINIA URANIUM, INC., ET AL. *v.* WARREN ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 16–1275. Argued November 5, 2018—Decided June 17, 2019

Petitioner Virginia Uranium, Inc., wants to mine raw uranium ore from a site near Coles Hill, Virginia, but Virginia law flatly prohibits uranium mining in the Commonwealth. The company filed suit, alleging that, under the Constitution's Supremacy Clause, the Atomic Energy Act (AEA) preempts state uranium mining laws like Virginia's and ensconces the Nuclear Regulatory Commission (NRC) as the lone regulator in the field. Both the District Court and the Fourth Circuit rejected the company's argument, finding that while the AEA affords the NRC considerable authority over the nuclear fuel life cycle, it offers no hint that Congress sought to strip States of their traditional power to regulate mining on private lands within their borders.

*Held*: The judgment is affirmed.

848 F. 3d 590, affirmed.

JUSTICE GORSUCH, joined by JUSTICE THOMAS and JUSTICE KAVANAUGH, concluded that the AEA does not preempt Virginia's law banning uranium mining. Pp. 3–17.

(a) Virginia Uranium claims that the AEA is best read to reserve to the NRC alone the regulation of uranium mining based on nuclear safety concerns. But the AEA contains no provision expressly preempting state law. More pointedly, it grants the NRC extensive and sometimes exclusive authority to regulate nearly every aspect of the nuclear fuel life cycle *except* mining, expressly stating that the NRC's regulatory powers arise only "after [uranium's] removal from its place of deposit in nature," 42 U. S. C. §2092. And statutory context confirms this reading: If the federal government wants to control uranium mining on private land, it must purchase or seize the land by eminent domain and make it federal land, §2096, indicating that

state authority remains untouched.  Later amendments to the AEA point to the same conclusion.  Section 2021 allows the NRC to devolve certain of its regulatory powers to the States but does nothing to extend the NRC's power to activities, like mining, historically beyond its reach.  And §2021(k) explains that States remain free to regulate the activities discussed in §2021 for purposes other than nuclear safety without the NRC's consent.  Virginia Uranium contends instead that subsection (k) greatly expands the AEA's preemptive effect by demanding the displacement of any state law enacted for the purpose of protection the public against "radiation hazards."  But subsection (k) merely clarifies that nothing in §2021 limits States' ability to regulate the activities subject to NRC control for other purposes.  In addition, the company's reading would prohibit not only the States from regulating uranium mining to protect against radiation hazards but the federal government as well, since the AEA affords it no authority to regulate uranium mining on private land.  Pp. 4–7.

(b) Virginia Uranium also submits that preemption may be found in this Court's precedents, pointing to *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, which rejected a preemption challenge to a state law prohibiting the construction of new nuclear power plants after the Court observed that it was enacted out of concern with economic development, not for the purpose of addressing radiation safety hazards.  But *Pacific Gas* concerned a state moratorium on construction of new nuclear power plants, and nuclear plant construction has always been an area exclusively regulated by the federal government.  It is one thing to inquire exactingly into state legislative purposes when state law comes close to trenching on core federal powers; it is another thing altogether to insist on the same exacting scrutiny for state laws far removed from core NRC powers.  Later cases confirm the propriety of restraint in this area.  See, *e.g.*, *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238; *English* v. *General Elec. Co.*, 496 U. S. 72.  This Court has generally treated field preemption as depending on *what* the State did, not *why* it did it.  See, *e.g.*, *Arizona* v. *United States*, 567 U. S. 387.  And because inquiries into legislative purpose both invite well-known conceptual and practical problems and pose risks to federalism and individual liberty, this Court has long warned against undertaking potential misadventures into hidden state legislative intentions without a clear statutory mandate for the project, see, *e.g.*, *Shady Grove Orthopedic Associates, P. A.* v. *Allstate Ins. Co.*, 559 U. S. 393, 404–405.  Pp. 7–14.

(c) Virginia Uranium alternatively suggests that that the AEA displaces state law through so-called conflict preemption—in particular, that Virginia's mining law stands as an impermissible "obstacle to

the accomplishment and execution of the full purposes and objectives
of Congress," *Hines* v. *Davidowitz*, 312 U. S. 52, 67.   But any
"[e]vidence of pre-emptive purpose," whether express or implied,
must be "sought in the [statute's] text and structure." *CSX Transp.,
Inc.* v. *Easterwood*, 507 U. S. 658, 664.  Efforts to ascribe unenacted
purposes and objectives to a federal statute face many of the same
challenges as inquiries into state legislative intent.  The only thing a
court can be sure of is what can be found in the law itself.  And the
compromise that Congress actually struck in the AEA leaves mining
regulation on private land to the States and grants the NRC regula-
tory authority only *after* uranium is removed from the earth.  It is al-
so unclear whether laws like Virginia's might have a meaningful im-
pact on the development of nuclear power in this country given the
other available foreign and domestic sources of uranium.  Pp. 14–17.

  JUSTICE GINSBURG, joined by JUSTICE SOTOMAYOR and JUSTICE KA-
GAN, agreed with JUSTICE GORSUCH that the Commonwealth's mining
ban is not preempted but concluded that his discussion of the perils
of inquiring into legislative motive sweeps well beyond the confines of
this case.   Further, Virginia Uranium's obstacle preemption argu-
ments fail under existing doctrine, so there is little reason to question
whether that doctrine should be retained.  Pp. 1–14.

  (a) The Commonwealth has forbidden conventional uranium min-
ing on private land.  The AEA leaves that activity unregulated.  State
law on the subject is therefore not preempted, whatever the reason
for the law's enactment.  Pp. 7–8.

  (b) Section 2021(k) lends no support for Virginia Uranium's cause.
That provision is most sensibly read to clarify that the door newly
opened for state regulation of certain activities for nuclear safety
purposes left in place pre-existing state authority to regulate activi-
ties for nonradiological purposes.  House and Senate Reports endorse
this reading of §2021(k).  Pp. 8–9.

  (c) Virginia Uranium leans heavily on a statement in *Pacific Gas &
Elec. Co.* v. *State Energy Resources Conservation and Development
Comm'n*, 461 U. S. 190, that "the Federal Government has occupied
the entire field of nuclear safety concerns." *Id.*, at 212.  But neither
in that case nor in later decisions in its wake—*Silkwood* v. *Kerr-
McGee Corp.*, 464 U. S. 238; *English* v. *General Elec. Co.*, 496 U. S.
72—did the Court rest preemption on the purposes for which state
laws were enacted.  Indeed, in all three, the Court held that the laws
at issue were not preempted.  Moreover, the state law involved in *Pa-
cific Gas* addressed an activity—construction of nuclear power
plants—closely regulated by the AEA.  Inquiry into why the state law
at issue in that case was enacted was therefore proper under
§2021(k).  The Commonwealth's mining ban, in contrast, governs an

activity not regulated by the AEA. Pp. 9–10.

(d) The Solicitor General's argument—that the Commonwealth's mining ban is preempted because it is a pretext for regulating the radiological safety hazards of milling and tailings storage—is unpersuasive. To the degree the AEA preempts state laws based on the purposes for which they were enacted, §2021(k) stakes out the boundaries of the preempted field. *National Meat Assn.* v. *Harris*, 565 U. S. 452, distinguished. Pp. 10–11.

(e) Virginia Uranium and the United States also fail to show that the mining ban creates an "unacceptable 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Wyeth* v. *Levine*, 555 U. S. 555, 563–564. Pp. 12–14.

GORSUCH, J., announced the judgment of the Court and delivered an opinion, in which THOMAS and KAVANAUGH, JJ., joined. GINSBURG, J., filed an opinion concurring in the judgment, in which SOTOMAYOR and KAGAN, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which BREYER and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 16–1275

### VIRGINIA URANIUM, INC., ET AL., PETITIONERS *v.* JOHN WARREN, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 17, 2019]

JUSTICE GORSUCH announced the judgment of the Court and delivered an opinion, in which JUSTICE THOMAS and JUSTICE KAVANAUGH join.

Virginia Uranium insists that the federal Atomic Energy Act preempts a state law banning uranium mining, but we do not see it. True, the AEA gives the Nuclear Regulatory Commission significant authority over the milling, transfer, use, and disposal of uranium, as well as the construction and operation of nuclear power plants. But Congress conspicuously chose to leave untouched the States' historic authority over the regulation of mining activities on private lands within their borders. Nor do we see anything to suggest that the enforcement of Virginia's law would frustrate the AEA's purposes and objectives. And we are hardly free to extend a federal statute to a sphere Congress was well aware of but chose to leave alone. In this, as in any field of statutory interpretation, it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write.

I

Virginia Uranium thought its plan was pretty straight-forward.  First, the company wanted to use conventional mining techniques to extract raw uranium ore from a site near Coles Hill, Virginia.  Next, it intended to mill that ore into a usable form.  Typically performed at the mine site, milling involves grinding the ore into sand-sized grains and then exposing it to a chemical solution that leaches out pure uranium.  Once dried, the resulting mixture forms a solid "yellowcake," which the company planned to sell to enrichment facilities that produce fuel for nuclear reactors.  Finally, because the leaching process does not remove all of the uranium from the ore, the company expected to store the leftover "tailings" near the mine to reduce the chances of contaminating the air or water.

But putting the plan into action didn't prove so simple. Pursuant to the AEA, ch. 724, 60 Stat. 755, 42 U. S. C. §2011 *et seq.*, the NRC regulates milling and tailing storage activities nationwide, and it has issued an array of rules on these subjects.  See, *e.g.*, 10 CFR §40 *et seq.* (2018).  None of those, though, proved the real problem for Virginia Uranium.  The company hit a roadblock even before it could get to the point where the NRC's rules kick in: State law flatly prohibits uranium mining in Virginia. See Va. Code Ann. §§45.1–161.292:30, 45.1–283 (2013); 848 F. 3d 590, 593–594 (CA4 2017).

To overcome that obstacle, Virginia Uranium filed this lawsuit.  The company alleged that, under the Constitution's Supremacy Clause, the AEA preempts state uranium mining laws like Virginia's and ensconces the NRC as the lone regulator in the field.  And because the NRC's regulations say nothing about uranium mining, the company continued, it remains free to mine as it will in Virginia or elsewhere.

Both the district court and a divided panel of the Fourth Circuit rejected the company's argument.  The courts

acknowledged that the AEA affords the NRC considerable authority over the nuclear fuel life cycle. But both courts found missing from the AEA any hint that Congress sought to strip States of their traditional power to regulate mining on private lands within their borders. Given the significance of the question presented, we granted review. 584 U. S. \_\_\_ (2018).

## II

The Supremacy Clause supplies a rule of priority. It provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof," are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. This Court has sometimes used different labels to describe the different ways in which federal statutes may displace state laws—speaking, for example, of express, field, and conflict preemption. But these categories "are not rigidly distinct." *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 372, n. 6 (2000) (internal quotation marks omitted). And at least one feature unites them: Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to "a constitutional text or a federal statute" that does the displacing or conflicts with state law. *Puerto Rico Dept. of Consumer Affairs* v. *ISLA Petroleum Corp.*, 485 U. S. 495, 503 (1988); see also 3 J. Story, Commentaries on the Constitution of the United States §1831, p. 694 (1st ed. 1833) ("the supremacy of the laws is attached to those only, which are made in pursuance of the constitution").

Before us, Virginia Uranium contends that the AEA (and only the AEA) unseats state uranium mining regulations and that it does so under the doctrines of both field and conflict preemption. We examine these arguments

about the AEA's preemptive effect much as we would any other about statutory meaning, looking to the text and context of the law in question and guided by the traditional tools of statutory interpretation.  Here, no more than in any statutory interpretation dispute, is it enough for any party or court to rest on a supposition (or wish) that "it must be in there somewhere."

## A

We begin with the company's claim that the text and structure of the AEA reserve the regulation of uranium mining for the purpose of addressing nuclear safety concerns to the NRC alone—and almost immediately problems emerge.  Unlike many federal statutes,[1] the AEA contains no provision preempting state law in so many words.  Even more pointedly, the statute grants the NRC extensive and sometimes exclusive authority to regulate nearly every aspect of the nuclear fuel life cycle *except* mining.  Companies like Virginia Uranium must abide the NRC's rules and regulations if they wish to handle enriched uranium, to mill uranium ore or store tailings, or to build or run a nuclear power plant.  See 42 U. S. C. §§2111(a), 2113(a), 2073.  But when it comes to mining, the statute speaks very differently, expressly stating that the NRC's regulatory powers arise only "*after* [uranium's] removal from its place of deposit in nature."  §2092 (emphasis added).  As the government itself has conceded, this means that "uranium mining" lies "outside the NRC's jurisdiction," Brief for United States as *Amicus Curiae* 14, and the agency's grip takes hold only "at the mill, rather than at the mine," *In re Hydro Resources, Inc.*, 63 N. R. C. 510, 512 (2006).

---

[1] See, *e.g.*, *Chamber of Commerce of United States of America* v. *Whiting*, 563 U. S. 582, 594–595 (2011); *Geier* v. *American Honda Motor Co.*, 529 U. S. 861, 867 (2000).

What the text states, context confirms. After announcing a general rule that mining regulation lies outside the NRC's jurisdiction, the AEA carves out a notably narrow exception. On *federal* lands, the statute says, the NRC may regulate uranium mining. §2097. And if the federal government wants to control mining of uranium on *private* land, the AEA tells the NRC exactly what to do: It may purchase or seize the land by eminent domain and *make* it federal land. §2096. Congress thus has spoken directly to the question of uranium mining on private land, and every bit of what it's said indicates that state authority remains untouched.

Later amendments to the AEA point to the same conclusion. Some years after the statute's passage, Congress added a provision, currently codified in §2021, allowing the NRC to devolve certain of its regulatory powers to the States. Unsurprisingly, Congress indicated that the NRC must maintain regulatory control over especially sensitive activities like the construction of nuclear power plants. §2021(c). But under §2021(b) the NRC may now, by agreement, pass to the States some of its preexisting authorities to regulate various nuclear materials "for the protection of the public health and safety from radiation hazards." Out of apparent concern that courts might (mis)read these new provisions as prohibiting States from regulating any activity even tangentially related to nuclear power without first reaching an agreement with the NRC, Congress added subsection (k):

> "Nothing in this section [that is, §2021] shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards."

Section 2021, thus, did nothing to extend the NRC's power to activities, like mining, historically beyond its reach. Instead, it served only to allow the NRC to share

with the States some of the powers previously reserved to the federal government. Even then, the statute explained in subsection (k) that States remain free to regulate the activities discussed in §2021 for purposes *other than* nuclear safety without the NRC's consent. Indeed, if anything, subsection (k) might be described as a *non-preemption* clause.

Virginia Uranium's case hinges on a very different construction of subsection (k). The company suggests that, properly read, the provision greatly expands the preemptive effect of the AEA and demands the displacement of *any* state law (touching on mining or any other subject) if that law was enacted for the purpose of protecting the public against "radiation hazards." And, the company adds, Virginia's law bears just such an impermissible purpose.

In our view, this reading nearly turns the provision on its head. Subsection (k) does not displace traditional state regulation over mining or otherwise extend the NRC's grasp to matters previously beyond its control. It does not expose every state law on every subject to a searching judicial inquiry into its latent purposes. Instead and much more modestly, it clarifies that "nothing in this [new] section [2021]"—a section allowing for the devolution-by-agreement of federal regulatory authority—should be construed to curtail the States' ability to regulate the activities discussed in that *same section* for purposes other than protecting against radiation hazards. So only state laws that seek to regulate the activities discussed in §2021 without an NRC agreement—activities like the construction of nuclear power plants—may be scrutinized to ensure their purposes aim at something other than regulating nuclear safety. Really, to accomplish all it wants, Virginia Uranium would have to persuade us to read 13 words out of the statute and add 2 more:

> ~~Nothing in this section shall be construed to affect the authority of~~ any State or local agency ~~to~~ **may** regulate activities **only** for purposes other than protection against radiation hazards.

That may be a statute some would prefer, but it is not the statute we have.

Just consider what would follow from Virginia Uranium's interpretation. Not only would States be prohibited from regulating uranium mining to protect against radiation hazards; the federal government likely would be barred from doing so as well. After all, the NRC has long believed, and still maintains, that the AEA affords it no authority to regulate uranium mining on private land. Nor does Virginia Uranium dispute the federal government's understanding. Admittedly, if Virginia Uranium were to prevail here, the NRC might respond by changing course and seeking to regulate uranium mining for the first time. But given the statute's terms, the prospects that it might do so successfully in the face of a legal challenge appear gloomy. Admittedly, as well, federal air and water and other regulations might apply at a uranium mine much as at any other workplace. But the possibility that both state and federal authorities would be left unable to regulate the unique risks posed by an activity as potentially hazardous as uranium mining seems more than a little unlikely, and quite a lot to find buried deep in subsection (k). Talk about squeezing elephants into mouseholes. See *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 468 (2001).

### B

If the best reading of the AEA doesn't require us to hold the state law before us preempted, Virginia Uranium takes another swing in the same direction. Only this time, the company submits, our precedents have adopted a different, even if maybe doubtful, reading of the AEA that

we must follow. Most prominently, Virginia Uranium points to this Court's decision in *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190 (1983).

But here, too, problems quickly appear. *Pacific Gas rejected* a preemption challenge to a state law prohibiting the construction of new nuclear power plants. Along the way, the Court expressly dismissed the notion that §2021 establishes the federal government as "the sole regulator of all matters nuclear." *Id.*, at 205. The Court observed that subsection (k) addresses itself only to "the preemptive effect of 'this section,' that is [§2021]." *Id.*, at 210. And the Court acknowledged that subsection (k) does not "cut back on pre-existing state authority outside the NRC's jurisdiction," a field that surely includes uranium mining. *Id.*, at 209. None of this remotely helps Virginia Uranium's cause.

Still, Virginia Uranium seeks to make the best of a bad situation. The company points out that *Pacific Gas* upheld the state law at issue there only after observing that it was enacted out of concern with economic development, not for the purpose of addressing radiation safety hazards. *Id.*, at 205. From this, the company reasons, we should infer that *any* state law enacted with the purpose of addressing nuclear hazards must fall thanks to our precedent.

But even that much does not follow. Since the passage of the AEA, the NRC has always played a significant role in regulating the construction of nuclear power plants. Indeed, under §2021(c) this remains one area where the NRC generally cannot devolve its responsibilities to the States. See *id.*, at 197–198, 206–207. And because §2021 classifies the construction of nuclear power plants as one of the core remaining areas of special federal concern, any state law regulating that activity risks being subjected to an inquiry into its purposes under subsection (k). But the

activity Virginia's law regulates—mining on private land—isn't one the AEA has ever addressed, and it isn't one §2021 discusses, so subsection (k) does not authorize any judicial inquiry into state legislative purpose in this case.

Admittedly, there is a wrinkle here. *Pacific Gas* seemed to accept California's argument that its law addressed *whether* new power plants may be built, while the NRC's regulatory power under §2021(c) extends only to the question *how* such plants are constructed and operated. *Id.*, at 212. And accepting (without granting) these premises, it would appear that California's law did *not* implicate an activity addressed by §2021, so an inquiry into state legislative purpose under subsection (k) was not statutorily authorized. Yet *Pacific Gas* inquired anyway, perhaps on the unstated belief that the state law just came "too close" to a core power §2021(c) reserves to the federal government. Does that mean we must do the same? Certainly Virginia Uranium sees it that way.

We do not. Just because *Pacific Gas* may have made more of state legislative purposes than the terms of the AEA allow does not mean we must make more of them yet. It is one thing to do as *Pacific Gas* did and inquire exactingly into state legislative purposes when state law prohibits a regulated activity like the construction of a nuclear plant, and thus comes close to trenching on core federal powers reserved to the federal government by the AEA. It is another thing to do as Virginia Uranium wishes and impose the same exacting scrutiny on state laws prohibiting an activity like mining far removed from the NRC's historic powers. And without some clearer congressional mandate suggesting an inquiry like that would be appropriate, we decline to undertake it on our own authority. The preemption of state laws represents "a serious intrusion into state sovereignty." *Medtronic, Inc.* v. *Lohr*, 518 U. S. 470, 488 (1996) (plurality opinion). And to order

preemption based not on the strength of a clear congressional command, or even on the strength of a judicial gloss requiring that much of us, but based only on a doubtful *extension* of a questionable judicial gloss would represent not only a significant federal intrusion into state sovereignty. It would also represent a significant judicial intrusion into Congress's authority to delimit the preemptive effect of its laws. Being in for a dime doesn't mean we have to be in for a dollar.

This Court's later cases confirm the propriety of restraint in this area. In a decision issued just a year after *Pacific Gas* (and by the same author), this Court considered whether the AEA preempted state tort remedies for radiation injuries after a nuclear plant accident. *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238 (1984). In doing so, the Court did not inquire into state legislative purposes, apparently because it thought state tort law (unlike a law prohibiting the construction of a nuclear power plant) fell beyond any fair understanding of the NRC's reach under the AEA. *Id.*, at 251. Exactly the same, as we have seen, can be said of Virginia's mining law. In fact, if the *Silkwood* Court *had* inquired into state legislative purposes, the law there might well have been harder to sustain than the one now before us. State tort laws, after all, plainly intend to regulate public safety. And as applied in *Silkwood*, state tort law sought to regulate the safety of a nuclear plant's operations, an area of special federal interest under §2021(c). *Id.*, at 256. Nothing comparable, of course, can be said of the mining regulations before us. Some years later, this Court in *English* v. *General Elec. Co.*, 496 U. S. 72 (1990), went further still, casting doubt on whether an inquiry into state legislative purposes had been either necessary or appropriate in *Pacific Gas* itself. 496 U. S., at 84–85, n. 7 ("Whether the *suggestion* of the majority in *Pacific Gas* that legislative purpose is relevant to the definition of the pre-empted field is part of the

*holding* of that case is not an issue before us today" (emphasis added)).

If *Pacific Gas* and its progeny alone marked our path, this case might be a close one, as our dissenting colleagues suggest. *Post*, at 3–5 (opinion of ROBERTS, C. J.). But for us any lingering doubt dissipates when we consult other cases in this area and this Court's traditional tools of statutory interpretation.[2]

Start with the fact that this Court has generally treated field preemption inquiries like this one as depending on *what* the State did, not *why* it did it. Indeed, this Court has analyzed most every other modern field preemption doctrine dispute in this way—from immigration, *Arizona* v. *United States*, 567 U. S. 387 (2012), to arbitration, *AT&T Mobility LLC* v. *Concepcion*, 563 U. S. 333 (2011), to foreign affairs, *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363 (2000), to railroads, *Kurns* v. *Railroad Friction Products Corp.*, 565 U. S. 625 (2012), to energy, *Hughes* v. *Talen Energy Marketing*, *LLC*, 578 U. S. \_\_\_ (2016), to civil procedure, *Shady Grove Orthopedic Associates*, *P. A.* v. *Allstate Ins. Co.*, 559 U. S. 393 (2010). It is unclear why we would proceed differently here without some clear congressional instruction requiring it.[3]

——————

[2] Far from "sweep[ing] well beyond the confines of this case," as our concurring colleagues suggest, see *post,* at 1 (GINSBURG, J., concurring in judgment), these considerations are, to us, essential to its resolution.

[3] Certainly the dissent's case, *National Meat Assn.* v. *Harris*, 565 U. S. 452 (2012), doesn't command a different result. There, the Court merely enforced an express statutory preemption clause that prohibited States from setting standards for handling non-ambulatory pigs that differed from federal standards. As we've seen, the AEA contains no comparable preemption clause forbidding Virginia to regulate mining in any way. Admittedly, *National Meat* went on to say that a State could not enforce a preempted animal-handling standard indirectly by banning the sale of meat from non-ambulatory pigs if its law "function[ed] as a command to slaughterhouses to structure their operations in the exact way" state regulators desired rather than as federal

Our field preemption cases proceed as they do, moreover, for good reasons. Consider just some of the costs to cooperative federalism and individual liberty we would invite by inquiring into state legislative purpose too precipitately. The natural tendency of regular federal judicial inquiries into state legislative intentions would be to stifle deliberation in state legislatures and encourage resort to secrecy and subterfuge. That would inhibit the sort of open and vigorous legislative debate that our Constitution recognizes as vital to testing ideas and improving laws. In Virginia Uranium's vision as well, federal courts would have to allow depositions of state legislators and governors, and perhaps hale them into court for cross-examination at trial about their subjective motivations in passing a mining statute. And at the end of it all, federal courts would risk subjecting similarly situated persons to radically different legal rules as judges uphold and strike down materially identical state regulations based only on the happenstance of judicial assessments of the "true" intentions lurking behind them. In light of all this, it can surprise no one that our precedents have long warned against undertaking potential misadventures into hidden state legislative intentions without a clear statutory mandate for the project. See, *e.g.*, *Shady Grove*, 559 U. S., at 404–405; *Rowe* v. *New Hampshire Motor Transp. Assn.*, 552 U. S. 364, 373–374 (2008); *Palmer* v. *Thompson*, 403 U. S. 217, 225 (1971); *Arizona* v. *California*, 283 U. S. 423, 455, n. 7 (1931) (collecting cases).

To be sure, Virginia Uranium insists that we don't need to worry about concerns like these in this case. We don't, the company says, because Virginia has admitted that it enacted its law with the (impermissible) purpose of pro-

_____

standards required. *Id.*, at 464. But here, by contrast, no one suggests that Virginia's mining law requires anyone to disregard NRC regulations.

tecting the public from nuclear safety hazards. But the Commonwealth denies making any such admission. Instead, it says it has merely accepted as true the allegations in the company's complaint about the intentions animating state law for purposes of the Commonwealth's own motion to dismiss this suit under Federal Rule of Civil Procedure 12(b)(6). If the case were to proceed beyond the pleadings stage, Virginia insists, a more searching judicial inquiry into the law's motivation would be inevitable. Whoever may be right about the status of Virginia's admissions in this case, though, the point remains that following Virginia Uranium's lead would require serious intrusions into state legislative processes in future cases.

Beyond these concerns, as well, lie well-known conceptual and practical ones this Court has also advised against inviting unnecessarily. State legislatures are composed of individuals who often pursue legislation for multiple and unexpressed purposes, so what legal rules should determine when and how to ascribe a particular intention to a particular legislator? What if an impermissible intention existed but wasn't necessary to her vote? And what percentage of the legislature must harbor the impermissible intention before we can impute it to the collective institution? Putting all that aside, how are courts supposed to conduct a reasonable inquiry into these questions when recorded state legislative history materials are often not as readily available or complete as their federal counterparts? And if trying to peer inside legislators' skulls is too fraught an enterprise, shouldn't we limit ourselves to trying to glean legislative purposes from the statutory text where we began? Even *Pacific Gas* warned future courts against too hastily accepting a litigant's invitation to "become embroiled in attempting to ascertain" state legislative "motive[s]," acknowledging that such inquiries "often" prove "unsatisfactory venture[s]. What motivates

one legislator to vote for a statute is not necessarily what motivates scores of others to enact it." 461 U. S., at 216 (citation omitted). See also *Shady Grove*, 559 U. S., at 403–404, n. 6; *Palmer*, 403 U. S., at 225; *Edwards* v. *Aguillard*, 482 U. S. 578, 636–639 (1987) (Scalia, J., dissenting). Cf. *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75, 79 (1998). We think these warnings wise, and we heed them today.

C

If the AEA doesn't occupy the field of radiation safety in uranium mining, Virginia Uranium suggests the statute still displaces state law through what's sometimes called conflict preemption. In particular, the company suggests, Virginia's mining law stands as an impermissible "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941). On Virginia Uranium's account, Congress sought to capture the benefits of developing nuclear power while mitigating its safety and environmental costs. And, the company contends, Virginia's moratorium disrupts the delicate "balance" Congress sought to achieve between these benefits and costs. Maybe the text of the AEA doesn't touch on mining in so many words, but its authority to regulate later stages of the nuclear fuel life cycle would be effectively undermined if mining laws like Virginia's were allowed.

A sound preemption analysis cannot be as simplistic as that. No more than in field preemption can the Supremacy Clause be deployed here to elevate abstract and unenacted legislative desires above state law; only federal laws "made in pursuance of" the Constitution, through its prescribed processes of bicameralism and presentment, are entitled to preemptive effect. Art. VI, cl. 2; *ISLA Petroleum*, 485 U. S., at 503. So any "[e]vidence of

pre-emptive purpose," whether express or implied, must therefore be "sought in the text and structure of the statute at issue." *CSX Transp., Inc.* v. *Easterwood,* 507 U. S. 658, 664 (1993).

Sound and well-documented reasons underlie this rule too. Efforts to ascribe unenacted purposes and objectives to a federal statute face many of the same challenges as inquiries into state legislative intent. Trying to discern what motivates legislators individually and collectively invites speculation and risks overlooking the reality that individual Members of Congress often pursue multiple and competing purposes, many of which are compromised to secure a law's passage and few of which are fully realized in the final product. Hefty inferences may be required, as well, when trying to estimate whether Congress would have wanted to prohibit States from pursuing regulations that may happen to touch, in various degrees and different ways, on unenacted federal purposes and objectives. Worse yet, in piling inference upon inference about hidden legislative wishes we risk displacing the legislative compromises actually reflected in the statutory text— compromises that sometimes may seem irrational to an outsider coming to the statute cold, but whose genius lies in having won the broad support our Constitution demands of any new law. In disregarding these legislative compromises, we may only wind up displacing perfectly legitimate state laws on the strength of "purposes" that only we can see, that may seem perfectly logical to us, but that lack the democratic provenance the Constitution demands before a federal law may be declared supreme. See, *e.g.*, *Pacific Gas*, 461 U. S., at 222 (acknowledging that under the AEA "the promotion of nuclear power is not to be accomplished 'at all costs'"); *Cyan, Inc.* v. *Beaver County Employees Retirement Fund*, 583 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (slip op., at 14–15); *Aguillard*, 482 U. S., at 636–639 (Scalia, J., dissenting); *United States* v. *O'Brien*, 391 U. S.

367, 382–384 (1968); *Fletcher* v. *Peck*, 6 Cranch 87, 130 (1810).

So it may be that Congress meant the AEA to promote the development of nuclear power. It may be that Congress meant the AEA to balance that goal against various safety concerns. But it also may be that Members of Congress held many other disparate or conflicting goals in mind when they voted to enact and amend the AEA, and many different views on exactly how to manage the competing costs and benefits. If polled, they might have reached very different assessments, as well, about the consistency of Virginia's law with their own purposes and objectives. The only thing a court can be sure of is what can be found in the law itself. And every indication in the law before us suggests that Congress elected to leave mining regulation on private land to the States and grant the NRC regulatory authority only *after* uranium is removed from the earth. That compromise may not be the only permissible or even the most rationally attractive one, but it is surely both permissible and rational to think that Congress might have chosen to regulate the more novel aspects of nuclear power while leaving to States their traditional function of regulating mining activities on private lands within their boundaries.[4]

As an alternative to proceeding down the purposes-and-objectives branch of conflict preemption, Virginia Uranium might have pursued another. Our cases have held that we

─────────────

[4] The concurrence takes a slightly different tack. It seems to accept the premise that the Court can divine the unenacted "purposes" and "objectives" underlying the AEA and weigh them against Virginia's mining law. But in rejecting Virginia Uranium's argument, it winds up emphasizing repeatedly that the *text* of the AEA does not address mining. See *post*, at 12–14. That may not fully address Virginia Uranium's assertion that state mining regulations interfere with a latent statutory purpose lying *beyond* the text, but it does highlight the propriety of confining our inquiries to the statute's terms.

can sometimes infer a congressional intent to displace a state law that makes compliance with a federal statute impossible. *English*, 496 U. S., at 79. But Virginia Uranium hasn't pursued an argument along any of these lines, and understandably so. Not only *can* Virginia Uranium comply with both state and federal laws; it is also unclear whether laws like Virginia's might have a meaningful impact on the development of nuclear power in this country. Some estimate that the United States currently imports over 90 percent of the uranium used in this country. App. to Pet. for Cert. 19a. Domestic uranium mines currently exist on federal lands as well and are thus beyond the reach of state authorities. *Ibid.* And if the federal government concludes that development of the Coles Hill deposit or any other like it is crucial, it may always purchase the site (or seize it through eminent domain) under the powers Congress has supplied. 42 U. S. C. §2096. All this may be done without even amending the AEA, itself another course which Congress is always free to pursue—but which this Court should never be tempted into pursuing on its own.

*

The judgment of the court of appeals is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–1275

_____

## VIRGINIA URANIUM, INC., ET AL., PETITIONERS _v._ JOHN WARREN, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 17, 2019]

JUSTICE GINSBURG, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, concurring in the judgment.

Soon after discovery of a large deposit of uranium ore in Virginia in the late 1970s, the Commonwealth banned uranium mining. Petitioners (collectively, Virginia Uranium) now seek to mine that deposit. They challenge the Commonwealth's uranium mining ban as preempted by the Atomic Energy Act (AEA or Act), 42 U. S. C. §2011 _et seq._, either because the ban intrudes on the federally occupied field of nuclear safety, or because it obstructs realization of federal purposes and objectives.

I reach the same bottom-line judgment as does JUSTICE GORSUCH: The Commonwealth's mining ban is not preempted. And I agree with much contained in JUSTICE GORSUCH's opinion. See _ante,_ at 4–10. But his discussion of the perils of inquiring into legislative motive, see _ante,_ at 11–14, sweeps well beyond the confines of this case, and therefore seems to me inappropriate in an opinion speaking for the Court, rather than for individual members of the Court. Further, Virginia Uranium's obstacle preemption arguments fail under existing doctrine, so there is little reason to question, as JUSTICE GORSUCH does, see _ante_, at 14–16, whether that doctrine should be retained. For these reasons, I join the Court's judgment, and separately state how I would resolve the instant controversy.

# I

## A

The production of nuclear fuel begins with mining uranium, a radioactive metal. See *ante,* at 1–2; Brief for Former Nuclear Regulators as *Amici Curiae* 7. Conventionally, uranium ore is mined and then "milled"—crushed and treated with chemicals that extract the usable uranium. *Ibid.* The resulting concentrated uranium oxide, known as yellowcake, is shipped elsewhere for conversion, enrichment, and fabrication into fuel. *Ibid.* Producing just a pound of usable uranium requires milling hundreds or even thousands of pounds of ore. H. R. Rep. No. 95–1480, pt. 1, p. 11 (1978). Milling thus generates vast quantities of "tailings": Sandy waste that is radioactive, contains toxic heavy metals, *ibid.,* and must "be carefully regulated, monitored, and controlled," U. S. NRC, Conventional Uranium Mills (rev. May 15, 2017), https://www .nrc.gov/materials/uranium‑recovery/extraction‑methods/ conventional-mills.html (as last visited June 12, 2019). Milling and tailings storage typically occur within 30 miles of the place where uranium is mined. *Ibid.*

The Federal Government regulates much of this process, primarily to protect public health and safety from radiation, but also for national security reasons. *English* v. *General Elec. Co.*, 496 U. S. 72, 81–82 (1990); *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 207, 211–212 (1983) (*PG&E*). Under the AEA, a federal license is required to, *inter alia*, "transfer or receive in interstate commerce" nontrivial quantities of "source material," including uranium ore, "after removal from its place of deposit in nature," §§2092, 2014(z). See also §§2091–2099. Licensing requirements also apply to the production, possession, or disposal of "byproduct material," including tailings. See §§2014(e), 2111–2114. Federal regulations govern, as well, subsequent processes, including uranium enrichment

and nuclear power generation. See, *e.g.,* §§2131–2142.

The Federal Government does not regulate conventional uranium mining on private land, having long taken the position that its authority begins "at the mill, rather than at the mine." *In re Hydro Resources, Inc.*, 63 N. R. C. 510, 512–513 (2006); Brief for United States as *Amicus Curiae* 4. See also *ante,* at 4–6. And while the Federal Government has exclusive authority over the radiation hazards of milling and subsequent stages of the nuclear fuel cycle, States may regulate these activities for other purposes. See §2018 (AEA does not affect state authority over "the generation, sale, or transmission of electric power produced" by nuclear powerplants); *English*, 496 U. S., at 81–82; *PG&E*, 461 U. S., at 207, 211–212.

The AEA provides a means by which States may take over federal responsibility for regulating the nuclear safety aspects of milling and the disposal of tailings. See 42 U. S. C. §2021. In 1959, Congress amended the AEA to "recognize the interests of the States in the peaceful uses of atomic energy, and to clarify the respective responsibilities under th[e] Act of the States and [federal authorities] with respect to the regulation of byproduc[t and] source . . . materials." Act of Sept. 23, 1959, 73 Stat. 688, as amended, 42 U. S. C. §2021(a)(1). The Nuclear Regulatory Commission (NRC) and a State may agree for the former to devolve to the latter authority to regulate source or byproduct materials "for the protection of the public health and safety from radiation hazards." §2021(b). "During the duration of such an agreement . . . the State shall have authority to regulate the materials covered by the agreement for the protection of the public health and safety from radiation hazards." *Ibid.* Section 2021(c) prohibits the NRC, however, from devolving its authority over "more dangerous activities—such as nuclear reactors." S. Rep. No. 870, 86th Cong., 1st Sess., 8 (1959). Finally, and of critical importance to this case, §2021(k)

provides that "[n]othing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards."

## B

In the late 1970s, uranium ore was discovered under Coles Hill, an unincorporated community in Pittsylvania County, Virginia. App. to Pet. for Cert. 216a. Totaling 119 million pounds of uranium ore, the deposit is the Nation's largest. *Id.,* at 201a. See also 848 F. 3d 590, 593 (CA4 2017) (case below). After a private company began leasing mineral rights to the deposit, the Virginia General Assembly directed the state Coal and Energy Commission to study the effects on the environment and public health of uranium exploration, mining, and milling. H. J. Res. No. 324, 1981 Va. Acts p. 1404; App. to Pet. for Cert. 216a.

The next year, the General Assembly authorized uranium exploration but imposed a one-year moratorium on uranium mining. 1982 Va. Acts ch. 269. The Assembly's stated purpose was "to encourage and promote the safe and efficient exploration for uranium resources within the Commonwealth, and to assure . . . that uranium mining and milling will be subject to statutes and regulations which protect the environment and the health and safety of the public." *Ibid.* The Assembly soon extended the ban "until a program for permitting uranium mining is established by statute." 1983 Va. Acts ch. 3. The Commonwealth has not established a permitting program, so the ban remains in force.

A slowdown in construction of new nuclear powerplants in the 1980s contributed to a "precipitous decline in the price of uranium ore." *Huffman* v. *Western Nuclear, Inc.*, 486 U. S. 663, 666–667, and n. 5 (1988). Rising prices in the first decade of the new millennium prompted renewed interest in mining the deposit, and Virginia Uranium

lobbied to have the ban repealed. App. to Pet. for Cert. 222a; Brief for United States as *Amicus Curiae* 9.

When efforts to persuade the state legislature proved unsuccessful, Virginia Uranium brought this suit seeking a declaration that the ban is preempted by federal law and an injunction requiring the Commonwealth to issue uranium mining permits. App. to Pet. for Cert. 237a. Respondents, Virginia Department of Mines, Minerals, and Energy officials (together, the Commonwealth Defendants), moved to dismiss the complaint for failure to state a claim, and the District Court granted the motion. *Virginia Uranium, Inc.* v. *McAuliffe*, 147 F. Supp. 3d 462, 478 (WD Va. 2015).[1] The Court of Appeals for the Fourth Circuit affirmed, holding in principal part that because the Commonwealth's mining ban did not regulate an activity overseen by the NRC, there was no need to consider the purposes for which the ban was imposed. 848 F. 3d, at 597–598. Given the importance of the issue, and to resolve a division of authority among the Courts of Appeals, we granted Virginia Uranium's petition for a writ of certiorari. Compare *id.*, at 594–599 (case below), with, *e.g., Skull Valley Band of Goshute Indians* v. *Nielson*, 376 F. 3d 1223, 1246 (CA10 2004) (state laws grounded in nuclear safety concerns are preempted).

## II

Under the Supremacy Clause, the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof," are "the supreme Law of the Land." Art. VI, cl. 2. "Put simply, federal law preempts contrary

_____

[1] The District Court also dismissed the Commonwealth's Governor and several other state officials as defendants on the ground that the Eleventh Amendment barred suit against them. *Virginia Uranium, Inc.* v. *McAuliffe*, 147 F. Supp. 3d 462, 467–468 (WD Va. 2015). Virginia Uranium did not appeal from that part of the District Court's decision.

state law." *Hughes* v. *Talen Energy Marketing, LLC*, 578 U. S. \_\_\_, \_\_\_ (2016) (slip op., at 11).

This Court has delineated three circumstances in which state law must yield to federal law. *English*, 496 U. S., at 78–79. First, and most obvious, federal law operates exclusively when Congress expressly preempts state law. *Ibid.* Second, state law can play no part when "Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law." *Hughes*, 578 U. S., at \_\_\_ (slip op., at 11) (internal quotation marks omitted). Third, state law is rendered inoperative when it "actually conflicts with federal law," *English*, 496 U. S., at 79, as when a private party cannot "comply with both state and federal requirements," *Merck Sharp & Dohme Corp.* v. *Albrecht*, 587 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 2) (internal quotation marks omitted), or when state law "creates an unacceptable 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *Wyeth* v. *Levine*, 555 U. S. 555, 563–564 (2009) (quoting *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941)). Whatever the category of preemption asserted, "the purpose of Congress is the ultimate touchstone" in determining whether federal law preempts state law. *Hughes*, 578 U. S., at \_\_\_ (slip op., at 11) (internal quotation marks omitted). Virginia Uranium invokes both field and obstacle preemption; I address each in turn.

## A

Virginia Uranium's primary contention is that Congress has occupied the field of nuclear safety regulation, preempting state laws enacted because of concerns about the radiation safety of federally regulated activities. Defining the preempted field by reference to the purpose for which state laws were enacted finds "some support in the text of the [AEA]," *English*, 496 U. S., at 84, and, in

particular, §2021(k). Again, this provision states that
"[n]othing in [§2021] shall be construed to affect the au-
thority of any State . . . to regulate activities *for purposes
other than protection against radiation hazards*." (Em-
phasis added.) Section 2021(k) presupposes federal
preemption of at least some state laws enacted to guard
"against radiation hazards." Virginia Uranium and the
dissent read this subsection to include within the
preempted sphere *all* state laws motivated by concerns
about the radiation hazards of NRC-regulated activities.
Brief for Petitioners 35; *post,* at 2. The Commonwealth
Defendants would exclude from federal foreclosure state
laws directed to activities not regulated by the NRC. *E.g.,*
Tr. of Oral Arg. 33–34. The Commonwealth Defendants
have the better reading of the statute.

1

The Commonwealth has forbidden only conventional
uranium mining on private land, an activity all agree is
not federally regulated. *E.g., id*., at 9–10, 17–18, 30. The
controlling AEA provision, §2092, triggers federal regula-
tion only when source material is "remov[ed] from its place
of deposit in nature." Federal authorities have long read
that provision to preclude federal regulation of conven-
tional uranium mining. *Ante,* at 4; *supra,* at 4. In con-
trast to the AEA's express provisions for uranium mining
on public lands, §§2097–2098, the Act is nearly silent
about conventional uranium mining on private lands. See
*ante,* at 4–6. Indeed, insofar as the Act addresses private
conventional mining, it does so to bar federal regulators
from obtaining reports about ore "prior to removal from its
place of deposit in nature." §2095. Every indication, then,
is that Congress left private conventional mining unregu-
lated. And if Congress did not provide for regulation of
private conventional mining, it is hard to see how or why
state law on the subject would be preempted, whatever the

reason for the law's enactment.

### 2

Virginia Uranium's argument to the contrary rests on §2021(k), but that provision, correctly read, lends no support for Virginia Uranium's cause. By its terms, §2021(k) addresses only state authority to regulate "activities" for nonradiological purposes. Read in context of §2021 as a whole, "activities" means activities *regulated by the NRC*. See §2021(c), (*l*), (m), (*o*); *ante*, at 6 (§2021(k) "might be described as a *non-preemption* clause").

The AEA's context and history are corroborative. Prior to enactment of §2021(k), the Federal Government and States shared responsibility for most steps of the nuclear fuel cycle, with the former regulating primarily for public health and safety, and the latter regulating for economic and other nonradiological purposes. See *supra,* at 4. Section 2021 was designed "to heighten the States' role," *PG&E*, 461 U. S., at 209, by enabling federal regulators to cede their previously exclusive authority over the nuclear safety of several lower risk activities, §2021(b). Given this aim, §2021(k) is most sensibly read to clarify that the door newly opened for state regulation left in place pre-existing state authority "to regulate activities for purposes other than protection against radiation hazards." See *ante,* at 5–6. The House and Senate Reports are explicit on this point: Section §2021(k) was "intended to make it clear that the bill does not impair the State[s'] authority to regulate activities of [federal] licensees for the manifold health, safety, and economic purposes other than radiation protection"; the bill simply provides a means for States to obtain heretofore exclusively federal authority to regulate these activities for "protection against radiation hazards." S. Rep. No. 870, 86th Cong., 1st Sess., at 12; accord H. R. Rep. No. 1125, 86th Cong., 1st Sess., 12 (1959). Nothing suggests that Congress "intended to cut back on pre-

existing state authority outside the NRC's jurisdiction." *PG&E*, 461 U. S., at 209–210. That authority encompassed state laws regulating conventional uranium mining, even if enacted because of concerns about the radiological safety of postextraction, NRC-regulated steps in the nuclear fuel cycle.

3

Virginia Uranium leans most heavily on a statement in the Court's *PG&E* opinion: "[T]he Federal Government has occupied the entire field of nuclear safety concerns." 461 U. S., at 212. But in neither *PG&E* nor in later decisions in its wake, *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238 (1984), and *English*, 496 U. S. 72, did the Court rest preemption on the purposes for which state laws were enacted. Indeed, in all three, the Court held that the state laws at issue were not preempted. See *ante,* at 7–10.

Moreover, without gainsaying that it may sometimes be appropriate to inquire into the purpose for which a state law was enacted, *PG&E* calls for no such inquiry here. *PG&E* considered whether the AEA preempted a California law conditioning approval to build new nuclear plants on a finding that an adequate method existed for disposing of spent nuclear fuel. 461 U. S., at 197–198. The Court upheld the law because it was enacted out of concern for economic development, not because of radiation safety hazards. *Id.,* at 205, 213–216.

It is unsurprising that the *PG&E* Court asked why the California law had been enacted. The State's law addressed construction of a nuclear powerplant, an activity closely regulated by the Federal Government for nuclear safety purposes. See 42 U. S. C. §§2021(c)(1), 2132–2142; 10 CFR pt. 50 (2018). The Court therefore inquired whether the state law was enacted, in §2021(k)'s words, "for purposes other than protection against radiation hazards." Here, in contrast, the Commonwealth's mining

ban targets an exclusively state-regulated activity. See
*ante,* at 8–10.[2]

### 4

I am not persuaded by the Solicitor General's argument
that the Commonwealth's mining ban is preempted be-
cause it is a pretext for regulating the radiological safety
hazards of milling and tailings storage. See Brief for
United States as *Amicus Curiae* 28–30. To the degree the
AEA preempts state laws enacted for certain purposes,
§2021(k) stakes out the boundaries of the preempted field,
*i.e.,* state laws that apply to federally licensed activities
and are driven by concerns about the radiological safety of
those activities. We have no license to expand those
boundaries.

The case on which the Solicitor General primarily relies,
*National Meat Assn.* v. *Harris*, 565 U. S. 452 (2012), does
not counsel otherwise. *National Meat* concerned a set of
California laws that "dictat[ed] what slaughterhouses
must do with pigs that cannot walk, known in the trade as
nonambulatory pigs." *Id.,* at 455. The question presented:
Did California's prescriptions conflict with the Federal
Meat Inspection Act's express preemption of state law that
imposed requirements "in addition to, or different than
those made under" the Act? 21 U. S. C. §678. One of the
California provisions, a ban on the sale of meat or prod-
ucts from nonambulatory pigs, regulated a subject outside
the scope of the Federal Meat Inspection Act. *National
Meat*, 565 U. S., at 463. The Court nevertheless concluded

---

[2] The dissent insists that we are bound by language in *Pacific Gas &
Elec. Co.* v. *State Energy Resources Conservation and Development
Comm'n*, 461 U. S. 190 (1983) (*PG&E*), unnecessary to that decision.
*Post*, at 4–6. But as JUSTICE GORSUCH explains, *PG&E*'s inquiry into
the purpose for which *some* state laws were enacted does not mean we
must now extend that inquiry to *all* state laws. *Ante,* at 10 ("Being in
for a dime doesn't mean we have to be in for a dollar.").

that the sale ban fell within the scope of the Act's express preemption clause because it was intended to work together with other California provisions to impose additional requirements on slaughterhouse operations. *Id.,* at 463–464.

*National Meat* is not controlling here. No express preemption provision is involved. The mining ban sets no safety standards for federally supervised milling or tailings storage activities. True enough, the ban makes it far less likely, though not impossible, that such activities will take place in the Commonwealth.[3] In that regard, the Commonwealth's mining ban is more aptly analogized to state bans on slaughtering horses, upheld by courts of appeals and distinguished in *National Meat* from California's nonambulatory pig laws. Horse slaughtering bans, *National Meat* explained, "work[ed] at a remove from the sites and activities that the FMIA most directly governs" by ensuring that "no horses will be delivered to, inspected at, or handled by a slaughterhouse, because no horses will be ordered for purchase in the first instance." *Id.,* at 465, 467 (citing *Cavel Int'l, Inc.* v. *Madigan*, 500 F. 3d 551 (CA7 2007), and *Empacadora de Carnes de Fresnillo, S. A. de C. V.* v. *Curry*, 476 F. 3d 326 (CA5 2007)). The distinction drawn in *National Meat* thus supports this conclusion: A state law regulating an upstream activity within the State's authority is not preempted simply because a downstream activity falls within a federally occupied field.[4]

———————

[3] Were a similar deposit found over the state line, the mining ban at issue would not prevent uranium ore mined in North Carolina from being milled, and the resulting tailings stored, in the Commonwealth.

[4] The distinction drawn here does not turn, as the dissent misperceives, *post,* at 8, on whether the state-regulated activity is upstream or downstream of the federally preempted field. The Commonwealth regulated an activity, conventional uranium mining, that Congress left to state regulation. Again, nothing in the AEA shows that Congress intended to preempt such a law based on the purpose for which it was enacted.

B

Nor is the Commonwealth's mining ban preempted as an "unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wyeth*, 555 U. S., at 563–564 (internal quotation marks omitted). Together, Virginia Uranium and the United States identify four ways in which the mining ban supposedly conflicts with federal purposes and objectives. None carry the day.

First, Virginia Uranium contends that the mining ban conflicts with the "delicate balance" federal law has struck between promoting nuclear power and ensuring public safety. Brief for Petitioners 55–56; see Brief for United States as *Amicus Curiae* 31–33. But the Federal Government does not regulate the radiological safety of conventional uranium mining on private land, so federal law struck *no* balance in this area.

Second, Virginia Uranium contends that the mining ban "*prohibit[s]* the achievement of one of Congress['] 'primary purpose[s]': 'the promotion of nuclear power.'" Brief for Petitioners 56 (quoting *PG&E*, 461 U. S., at 221). *PG&E*, however, dismissed the suggestion that Congress had a policy of promoting nuclear power "at all costs." *Id.*, at 222 (internal quotation marks omitted). Given the absence of federal regulation in point, it is improbable that the Federal Government has a purpose or objective of promoting conventional uranium mining on private land. Cf. *ante,* at 16.

Virginia Uranium warns of dire consequences if all 50 States enact bans similar to the Commonwealth's. Brief for Petitioners 56–57. But, as the Court of Appeals explained, numerous domestic uranium recovery facilities are federally regulated (either because they sit on federal land or use unconventional mining techniques) and are "thus beyond the reach of any state bans"; and the AEA authorizes the Federal Government to develop uranium

deposits on public lands and to acquire private deposits. 848 F. 3d, at 599; see 42 U. S. C. §§2096–2097. Federal purposes and objectives do not require judicial supplementation of the AEA's express provisions for maintaining the uranium supply. Cf. *ante,* at 17.

The dissent suggests that national security may require further domestic uranium production. *Post,* at 2, n. 2. If the Executive Branch—which presumably knows more about "the critical role of uranium to the country's energy industry and national defense," *ibid.*—agrees, it can arrange for acquisition of the site by the United States, and then for commencement of mining notwithstanding the Commonwealth's ban. Yet the site remains in private hands.

Third, Virginia Uranium argues that §2021 provides the sole means for States to regulate radiological safety hazards resulting from milling and tailings storage, and that Virginia has effectively regulated milling and tailings storage without obtaining authority to do so through an adequate §2021 agreement. Brief for Petitioners 57–59 (citing *Gade* v. *National Solid Wastes Management Assn.*, 505 U. S. 88, 98–101 (1992)); see Brief for United States as *Amicus Curiae* 33–34. As explained, see *supra,* at 7–9, 11, Virginia has not regulated the radiological safety of tailings storage; it has prohibited only an antecedent activity subject to exclusive state authority.

Finally, the United States contends that Virginia's mining ban frustrates federal purposes and objectives by "prevent[ing] the occurrence of" activities that Congress intended the Federal Government to regulate. Brief for United States as *Amicus Curiae* 31 (quoting 848 F. 3d, at 600 (Traxler, J., dissenting)). But federal regulation of certain activities does not mean that States must authorize activities antecedent to those federally regulated. For example, federal regulation of nuclear powerplants does not demand that States allow the construction of such

powerplants in the first place. *PG&E*, 461 U. S., at 222.

\*   \*   \*

For the reasons stated, I concur in the Court's judgment affirming the judgment of the Court of Appeals.

# SUPREME COURT OF THE UNITED STATES

---

No. 16–1275

---

## VIRGINIA URANIUM, INC., ET AL., PETITIONERS *v.* JOHN WARREN, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 17, 2019]

CHIEF JUSTICE ROBERTS, with whom JUSTICE BREYER and JUSTICE ALITO join, dissenting.

Although one party will be happy with the result of today's decision, both will be puzzled by its reasoning. That's because the lead opinion sets out to defeat an argument that no one made, reaching a conclusion with which no one disagrees. Specifically, the opinion devotes its analysis to whether the field of uranium mining safety is preempted under the Atomic Energy Act, ultimately concluding that it is not. But no party disputes that. Rather, the question we agreed to address is whether a State can purport to regulate a field that is *not* preempted (uranium mining safety) as an indirect means of regulating other fields that *are* preempted (safety concerns about uranium milling and tailings). And on that question, our precedent is clear: The AEA prohibits state laws that have the purpose and effect of regulating preempted fields.

As relevant here, processing uranium ore involves three steps: mining, milling, and storing "tailings." *Mining* is the extracting of uranium ore from the ground; *milling* is the process of turning the substance into a usable form; and *tailings* are the leftover radioactive waste that must be safely stored.

There is no dispute over which of these fields the AEA reserves to the exclusive jurisdiction of the Nuclear Regu-

latory Commission.  The parties agree that the field of uranium *mining* safety is not preempted.  See Brief for Petitioners 3, 22, n. 4, 27; Reply Brief 8; Brief for Respondents 1; Brief for United States as *Amicus Curiae* 4, 14.  And it is undisputed that radiological safety concerns about *milling* and *tailings* are preempted fields.  See Brief for Petitioners 32; Tr. of Oral Arg. 36–37 (counsel for respondents); Brief for United States as *Amicus Curiae* 23. Indeed, that shared understanding was the basis of the question presented.[1]

Despite all this, the lead opinion insists that petitioners (hereafter the company) press an entirely different argument.  "Before us, Virginia Uranium contends that the AEA (and only the AEA) unseats state uranium mining regulations," *ante*, at 3, but "almost immediately problems emerge," *ante*, at 4.  Problems do immediately emerge in the opinion, but they are of its own making.  The company does not argue that the AEA reserves the field of uranium *mining* safety.  After attributing this failing argument to the company, the lead opinion then proceeds to explain why the argument must, in fact, fail.  See *ante*, at 3–10.

Turning to the question presented, however, the company's theory of the case is fairly straightforward.  The property at issue here contains the largest known uranium deposit in the country and one of the largest in the world.[2]  Shortly

———————

[1] "Does the AEA preempt a state law that on its face regulates an activity within its jurisdiction (here uranium mining), but has the purpose and effect of regulating the radiological safety hazards of activities entrusted to the NRC (here, the milling of uranium and the management of the resulting tailings)?"  Pet. for Cert. i.

[2] Oddly, the lead opinion and concurrence suggest that developing this site is unnecessary because domestic production accounts for less than ten percent of the uranium used in the country.  See *ante*, at 16–17 (lead opinion); *ante,* at 12–13 (GINSBURG, J., concurring in judgment).  But given the critical role of uranium to the country's energy industry and national defense, the near complete reliance on foreign sources of uranium—including substantial imports from Russia, Ka-

after its discovery, Virginia enacted a complete ban on uranium mining. According to the company, the ban was not motivated by concerns about mining safety. Instead, it was motivated by Virginia's desire to ban the more hazardous steps that come after mining—uranium milling and the storage of radioactive tailings—due to the Commonwealth's disagreement with the NRC over how to safely regulate those activities. And, crucially, Virginia has yet to put forward any other rationale to support the ban.[3] Thus, the question before us is whether, consistent with the AEA and our precedents, the Commonwealth may purport to regulate a non-preempted field (mining safety) with the purpose and effect of indirectly regulating a preempted field (milling and tailings). That should have made for an easy case.

Under our AEA precedents, a state law is preempted not only when it "conflicts with federal law," but also when its *purpose* is to regulate within a preempted field. *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation*

—————————

zakhstan, and Uzbekistan—would seem to suggest just the opposite. See App. to Pet. for Cert. 353a (detailing foreign sources of uranium imports); 42 U. S. C. §2012(d) ("The processing and utilization of source, byproduct, and special nuclear material must be regulated in the national interest and in order to provide for the common defense and security and to protect the health and safety of the public."); Energy Futures Initiatives, Inc., The U. S. Nuclear Energy Enterprise: A Key National Security Enabler 18 (Aug. 2017) ("A vibrant domestic nuclear energy industry, including a healthy supply chain . . . is essential for the achievement of U. S. national security objectives.").

[3] As the lead opinion acknowledges, Virginia has thus far in the litigation accepted the company's claim that the actual purpose of the mining ban is to regulate the radiological safety of uranium milling and tailings storage. See *ante,* at 11–12. Virginia contends that if the case were to proceed past the pleadings stage, it could establish a nonsafety rationale for the ban. See Brief for Respondents 47. That may well be true. See *id.,* at 11 (discussing environmental concerns). But for our purposes today, we must resolve the case on the terms that it has come to us.

*and Development Comm'n*, 461 U. S. 190, 212–213 (1983). Because "the Federal Government has occupied the entire field of nuclear safety concerns," a state law that is "grounded in [such] safety concerns falls squarely within the prohibited field." *Ibid.*; see also *English* v. *General Elec. Co.*, 496 U. S. 72, 84 (1990) (state regulations "motivated by [nuclear] safety concerns" are preempted by the AEA (citing 42 U. S. C. §2021(k))). For example, even though a State may generally regulate its roads, it may not shut down all of the roads to a nuclear power plant simply because it disagrees with the NRC's nuclear safety regulations. Here, because Virginia has not even disputed that its uranium mining ban was "grounded in" its "nuclear safety concerns" about uranium milling and tailings, the company's preemption claim should not have been dismissed.

The lead opinion and the concurrence miss that simple analysis because they shrink from our AEA precedents, particularly *Pacific Gas*. In *Pacific Gas*, California had banned the construction of nuclear power plants until the State could ensure that new plants would have a viable method for permanently disposing of nuclear waste. See 461 U. S., at 197–198. On its face, the ban did not purport to regulate a preempted field; it did not regulate the *manner* in which nuclear power plants may be constructed or operated, which is a field preempted by the AEA. See *id.*, at 212. If it had, the Court noted, the ban "would clearly be impermissible." *Ibid.* The California statute instead purported to address the antecedent question *whether* new plants should be constructed at all—an area within the State's traditional authority over the generation and cost of electricity.

But the Court did not stop its preemption analysis there. Instead, it was "necessary" to look beyond the face of the statute to determine California's "rationale" for the ban. *Id.*, at 213. California had argued that it could

exercise its traditional authority over power generation to "completely prohibit new construction until its safety concerns [we]re satisfied by the Federal Government." *Id.*, at 212. The Court flatly "reject[ed] this line of reasoning." *Ibid.* Because the AEA reserves the "field of nuclear safety concerns" to the Federal Government, a state law that was "grounded in" those concerns would fall "squarely within the prohibited field." *Id.*, at 212–213. In other words, if the purpose of California's ban on nuclear plant construction was to regulate radiological safety, it would be preempted. California's statute ultimately avoided that outcome, however, because the State had put forward an independent "nonsafety rationale"—namely, its concern that new nuclear plants would not be economically viable if they were unable to permanently dispose of nuclear waste. *Id.*, at 213. On that basis, the Court determined that the ban was not preempted. *Id.*, at 216 ("[W]e accept California's avowed economic *purpose* as the rationale for enacting [the statute]. Accordingly, the statute lies outside the occupied field of nuclear safety regulation." (emphasis added)).

*Pacific Gas* should control the outcome here. Like California's ban in that case, Virginia's ban on its face regulates a non-preempted field—uranium mining safety. Like the plaintiffs challenging the California ban, the mining company argues that the statute's purpose is really to regulate a preempted field—safety concerns about uranium milling and tailings. But unlike California in *Pacific Gas*, Virginia in this case has not put forward a "nonsafety rationale." That should have been the end of the story, at least at this stage of the litigation.

Neither the lead opinion nor the concurrence explain why this Court inquired into purpose in *Pacific Gas* but can dispense with that "necessary" step here, *id.*, at 213; they just say the Court can. See *ante*, at 8–9 (lead opinion); *ante*, at 10, n. 2 (opinion of GINSBURG, J.). At one

point, the lead opinion suggests that the AEA "author-
ize[s]" a purpose inquiry only when a state law "comes
close to trenching on core federal powers." *Ante*, at 9. But
the opinion does not say where that rule comes from.
Certainly not the statute or our precedents. And the lead
opinion never explains why the safety concerns about
nuclear plants in *Pacific Gas* are more "core" to the AEA
than the safety concerns about uranium milling and tail-
ings storage at issue here.

The central argument from my colleagues appears to be
that the AEA authorizes a purpose inquiry only when a
State "targets" or "seek[s] to regulate" an activity that is
also regulated by the federal statute. *Ante*, at 6 (lead
opinion); *ante*, at 10 (opinion of GINSBURG, J.). And be-
cause the Virginia statute *seeks* to regulate mining, the
AEA "does not authorize any judicial inquiry into state
legislative purpose in this case." *Ante*, at 8–9 (lead opin-
ion); see *ante*, at 9–10 (opinion of GINSBURG, J.). But it is
conceded that the mining ban was adopted because of
radiological safety concerns about milling and tailings.
That is why Virginia argues, as it must, that its mining
ban would not be preempted even if it expressly stated
that it was enacted due to the Commonwealth's disagree-
ment with the NRC's nuclear safety regulations. Tr. of
Oral Arg. 33. If such a statute does not "target" or "seek to
regulate" a preempted field, what would?

States may try to regulate one activity by exercising
their authority over another. That is the whole point of
the purpose inquiry mandated by *Pacific Gas*. Indeed,
*Pacific Gas* specifically "emphasize[d]" that the California
law did *not* expressly seek to regulate "the construction or
operation of a nuclear powerplant," that is, the statute on
its face was not directed at a preempted field. 461 U. S.,
at 212.

The AEA's purpose inquiry is most useful precisely
when the challenged state law does *not* purport to regulate

a preempted field. If a State disagrees with the AEA's nuclear safety regulations, and thus wants to block nuclear development within its borders, it has myriad ways to do so through its broad police powers. Under the rule adopted by the lead opinion and the concurrence, so long as the State is not boneheaded enough to express its real purpose in the statute, the State will have free rein to subvert Congress's judgment on nuclear safety.

A State could, for instance, restrict the ability of a county to provide a nuclear facility with municipal services like law enforcement, fire protection, and garbage collection. If it wanted to target investors, a State could eliminate limited liability for the stockholders of companies that operate nuclear facilities. Although these examples may seem farfetched, they have already happened. See *Skull Valley Band of Goshute Indians* v. *Nielson*, 376 F. 3d 1223, 1247–1248, 1250–1252 (CA10 2004). In *Skull Valley*, however, the Tenth Circuit correctly applied our precedent and concluded that the "state cannot use its authority to regulate law enforcement and other similar matters as a means of regulating radiological hazards." *Id.*, at 1248; see *Entergy Nuclear Vermont Yankee, LLC* v. *Shumlin*, 733 F. 3d 393 (CA2 2013) (applying *Pacific Gas* and concluding that a state statute was a pretext for regulating radiological safety). Neither the lead opinion nor the concurrence hazards an answer for cases like *Skull Valley*.

As these examples show, AEA preemption cannot turn on the label a State affixes to its regulations. That approach would simply invite evasion, which is why we have rejected it in our preemption cases more generally. For example, in *National Meat Assn.* v. *Harris*, 565 U. S. 452 (2012), we addressed a preemption challenge involving slaughterhouses in California. A federal statute preempted state regulation of slaughterhouses' front-end procedures for inspecting, handling, and slaughtering livestock. California, however, had regulated the back-end opera-

tions of slaughterhouses by prohibiting the *sale* of meat
from livestock that had not been inspected, handled, and
slaughtered according to the State's regulations. *Id.*, at
455, 463–464.

Although the federal statute's preemption clause did
"not usually foreclose state regulation of the commercial
sales activities of slaughterhouses," we unanimously held
that California's sales regulation was preempted because
it was a transparent attempt to circumvent federal law.
*Id.*, at 463 (internal quotation marks omitted). Conclud-
ing otherwise, we noted, would allow a State to "impose
any regulation on slaughterhouses just by framing it as a
ban on the sale of meat produced in whatever way the
State disapproved." *Id.*, at 464. And that "would make a
mockery of the [federal statute's] preemption provision."
*Ibid.*; see also *Engine Mfrs. Assn.* v. *South Coast Air Qual-
ity Management Dist.*, 541 U. S. 246, 255 (2004) (stating
that it "would make no sense" to allow a state regulation
to evade preemption simply because it addressed the
purchase, rather than manufacture, of a federally regulated
product).

The concurrence argues that *National Meat* is distin-
guishable because there the State regulated a down-
stream, non-preempted activity (sale of meat) in an effort
to regulate an upstream, preempted activity (processing of
livestock). Here, however, Virginia's regulation is up-
stream (mining) and the preempted activity is down-
stream (milling and tailings). *Ante*, at 11. That's true but
beside the point. Regardless whether the state regulation
is downstream like *National Meat*, upstream like here and
*Pacific Gas*, or entirely out of the stream like *Skull Valley*,
States may not legislate with the purpose and effect of
regulating a federally preempted field.[4]

———————
[4] In a footnote, the concurrence appears to reject its own analysis,
stating that it makes no difference whether the state law is upstream

That common sense approach is consistent with the text of the AEA, which recognizes that States continue to have authority "to regulate activities for *purposes* other than protection against radiation hazards." 42 U. S. C. §2021(k) (emphasis added). The lead opinion finds this purpose-based approach discomfiting, citing the "well-known conceptual and practical" difficulties about inquiring into legislative motive. *Ante*, at 13. The statute and our precedent plainly require such an approach here, however, and the difficulty of the task does not permit us to choose an easier way. I respectfully dissent.

––––––––––

or downstream of the federally preempted field. See *ante*, at 11, n. 4. Instead, the concurrence contends, the difference is that here the Commonwealth "regulated an activity, conventional uranium mining, that Congress left to state regulation." *Ibid.* But that is equally true in *National Meat*, where the State had likewise regulated an activity, the sale of meat, that Congress left to state regulation. See 565 U. S., at 463. The concurrence and lead opinion also note that *National Meat* involved an "express" preemption provision whereas this case does not. *Ante*, at 11, n. 3 (lead opinion); *ante*, at 11 (opinion of GINSBURG, J.). But they do not explain why that matters, and there's no reason it should. In both cases, the plaintiffs alleged that the State regulated an undisputedly non-preempted activity as an indirect means to regulate an undisputedly preempted activity.