

# NUMBER 13-24-00208-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**ANNA MERCEDEZ GUTIERREZ,**                                            **Appellant,**

**v.**

**STATE OF TEXAS,**                                                     **Appellee.**

---

## ON APPEAL FROM THE 63RD DISTRICT COURT
## OF KINNEY COUNTY, TEXAS

---

## DISSENTING OPINION

**Before Chief Justice Contreras and Justices Benavides and Silva
Dissenting Opinion by Justice Silva**

I object to the handing down of the majority opinion before December 30, 2024, and the suspension of Texas Rule of Appellate Procedure 49, and I respectfully dissent from the majority opinion.

I.

A.

Texas Government Code § 402.010 serves to "provide the attorney general with the opportunity to be heard on issues important to the laws of the state—the laws the attorney general's office is charged with defending and enforcing." *In re State*, No. 04-14-00282-CV, 2014 WL 2443910, at *2 (Tex. App.—San Antonio May 28, 2014, orig. proceeding) (mem. op.). A Texas court in which a pleading is filed challenging the constitutionality of a Texas statute must "notify the attorney general of state constitutional challenges" and may not "declar[e] a statute unconstitutional within 45 days after giving such notice." *In re State*, 489 S.W.3d 454, 454 (Tex. 2016) (orig. proceeding) (Willett, J., concurring); *see* TEX. GOV'T CODE ANN. § 402.010.

Gutierrez filed her amended brief in this Court on July 23, 2024. That brief included a challenge to the constitutionality of a Texas statute, making the brief a pleading filed in this Court that triggered the obligations of § 402.010. This Court sent notice of this constitutional challenge to the attorney general as required by § 402.010(a),[1] yet the majority opinion holding penal code § 20.05(a)(1)(A)[2] unconstitutional as applied is being handed down on December 16, 2024—just thirty-two days after this Court's notice—instead of on or after December 30, 2024, the end of the full forty-five-day period provided for by law. *See* TEX. GOV'T CODE ANN. § 402.010(b).

---

[1] Notice was sent to the attorney general's office on November 14, 2024, after briefing was complete and oral arguments had taken place.

[2] TEX. PENAL CODE ANN. § 20.05(a)(1)(A).

2

Nothing in the statute excuses appellate courts from full compliance with § 402.010 simply because the same constitutional challenge was filed in a different pleading in the trial court and notice of that trial court challenge was given to the attorney general.[3] Notice of the need to defend a statute in one court, at a particular time, in a particular proceeding and a particular procedural posture, is not notice of a challenge raised in a different court, at a later time, in a different type of proceeding and a different procedural posture. Hence all Texas courts, at all levels, have a duty to comply with § 402.010 whenever a pleading challenging the constitutionality of a Texas statute is filed in their respective courts. The Texas Court of Criminal Appeals has specifically held that the language of § 402.010(b)[4] applies to "any" Texas court, including itself. *Ex parte Lo*, 424 S.W.3d 10, 29 (Tex. Crim. App. 2013) ("This provision attempts to suspend a judgment of this Court, or any court . . . until forty-five days after notice has been provided to the attorney general."); *see also id.* at 32 (Keller, P.J., concurring) (noting that statute applied "not just to this Court, but to all courts").[5] As an intermediate appellate court, we should not decide otherwise. *See De Leon v. State*, 373 S.W.3d 644, 650 n.3 (Tex. App.—San Antonio 2012, pet. ref'd) (explaining that intermediate courts of appeals are bound by Texas Court of Criminal Appeals' precedent). But if there exist questions about the

---

[3] I note that there is nothing in the record in this case indicting that notice was given to the attorney general by the trial court as required by the statute. The record only reflects that Gutierrez certified that she emailed notice to the attorney general directly on certain pleadings in the trial court.

[4] While the case involved an earlier version of the statute, the language of subsection (b) reviewed by the Texas Court of Criminal Appeals is identical to the language in the current statute.

[5] The Texas Court of Criminal Appeals went on to hold the statute unconstitutional for violating the Texas Constitution's separation of powers provision. *Ex parte Lo*, 424 S.W.3d 10, 30 (Tex. Crim. App. 2013). The Texas Constitution was then amended to ratify the statute. *See* TEX. CONST. art. V, § 32.

manner in which appellate courts are to apply § 402.010,[6] perhaps the legislature needs to act if it wishes to ensure that the attorney general has the same notice and opportunity to defend Texas statutes from constitutional challenges in Texas appellate courts as it unquestionably has in Texas trial courts.

Cognizant that "no matter the perceived exigencies," we may not "short-circuit[ ] one Texas law in order to strike down another," *see In re State*, 489 S.W.3d at 456, 457 (Willett, J., concurring), I would have provided the attorney general the entire forty-five-day opportunity to defend penal code § 20.05(a)(1)(A) from the constitutional challenge raised in this Court.

B.

I also object to the majority's invocation of Texas Rule of Appellate Procedure 2 to suspend Texas Rule of Appellate Procedure 49 and thus deny the State, as well as the attorney general, the opportunity to seek a rehearing or en banc reconsideration. *See* TEX. R. APP. P. 2, 49.1, 49.5. Such action, along with the failure to wait to December 30, 2024, to hand down the decision, seems to entirely vitiate the Legislature's intent to allow the attorney general to defend the statute at this level.

---

[6] Section 402.010(a) provides that a court "*shall*, if the attorney general is not a party to or counsel involved in the litigation, serve notice of the constitutional challenge and a copy of the petition, motion, or other pleading that raises the challenge on the attorney general." TEX. GOV'T CODE ANN. § 402.010(a) (emphasis added). While this phrase could be read, as the majority does, to not trigger a court's duty to notify the attorney general of a constitutional challenge filed in its court unless the party has filed "the form required by Subsection (a-1)," the phrase does not expressly say so, and such a reading would allow parties to avoid attorney general involvement in their constitutional challenge by simply failing to file the required form—effectively making this notification provision optional. I am skeptical that this was the intent of the legislature. *See Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 637 (Tex. 2010) ("Courts 'do not lightly presume that the Legislature may have done a useless act.'") (quoting *Liberty Mut. Ins. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 485 (Tex. 1998)).

II.

I respectfully dissent to the majority opinion because I conclude that penal code § 20.05(a)(1)(A), as applied in this prosecution, is neither field- nor conflict-preempted by federal law.

A.

A person bringing an "as-applied" challenge "asserts that the statute is unconstitutional as applied to his particular facts and circumstances." *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011). "Because a statute may be valid as applied to one set of facts and invalid as applied to a different set of facts," a person bringing an as-applied challenge "must show that, in its operation, the challenged statute was unconstitutionally applied to him." *Id*.

In this case, the majority opinion sets out Gutierrez's "particular facts and circumstances" as

(1)     being prosecuted under the neutral language of § 20.05(a)(1)(A),

(2)     for an "immigration motive" as shown by prosecutor or law enforcement statements demonstrating reliance on evidence that,

(3)     the persons being smuggled are undocumented noncitizens.

*See ante*, at 13–17 (discussing trial record "showing an 'immigration motive,'" holding that "it [wa]s clear that the immigration status" of the smuggled persons "was the central fact upon which [Gutierrez's] arrest and prosecution were based[,]" and concluding that "[e]ven though the State charged her using the neutral language of § 20.05(a)(1)(A), the record demonstrates that she was in fact prosecuted for her transportation and concealment from law enforcement of undocumented noncitizens").

5

Under this formulation of "particular facts and circumstances," the majority opinion will have a very limited impact on what is sure to be a waning number of potential applications. By limiting the application of its opinion to cases where the record is clear that prosecution is being brought for an "immigration motive," the majority opinion carves out from its holding any prosecutions under § 20.05(a)(1)(A) in which the smuggled persons are undocumented noncitizens, but law enforcement does not rely on that fact to arrest, and prosecutors do not rely on that fact to convict.

The majority opinion's extensive analysis of the trial record to establish prosecutorial "immigration motive" both: (1) demonstrate the type of evidence any future appellant will need to show in order to establish that a prosecution fell under the same "particular facts and circumstances" as Gutierrez's; and (2) serves as guidance to law enforcement and prosecutors on how to avoid the application of the majority opinion to arrests and prosecutions under § 20.05(a)(1)(A). The latter only need ensure that "immigration status of the [smuggled persons]" is not the "central fact upon which [the] arrest and prosecution were based." *Ante*, at 15. The majority opinion acknowledges that a prosecutor need not "prove [the smuggled persons] immigration status" in order to convict under § 20.05(a)(1)(A), so better training of law enforcement officers and prosecutors should ensure that the majority opinion, if not a "one-off," will have a very restricted scope. Arrests and prosecutions under § 20.05(a)(1)(A) when undocumented noncitizens are the persons smuggled may continue without concern of preemption by federal law, so long as there is no reliance on immigration status and no "magical words"[7]

---

[7] See the following comments by United States Supreme Court Justice Neil Gorsuch in oral argument for *Kansas v. Garcia*, on reliance on "particular [prosecutorial] intentions in a particular case" to show statute unconstitutional "as applied," and noting that the prosecution could avoid "as-applied" federal

6

are used.

Despite the severely limited scope of the majority opinion, I feel compelled to address the majority's erroneous holdings on preemption, and I turn to those next.

B.

Texas's problems require Texas's solutions. Our Nation's system of "dual sovereignty between the States and the Federal Government" allows for just that. *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). "This federalist structure of joint sovereigns" benefits the citizens of the United States, as the more "decentralized government" of States are "more responsive" and "more sensitive to the diverse needs" of their own citizenry. *Id*. at 458. "The States thus retain substantial sovereign authority," particularly in the areas "reserved to the several States" which "extend[s] to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State.'" *Id*. at 457–58 (quoting THE FEDERALIST No. 45, at 292–93 (James Madison) (Clinton Rossiter ed., 1961)).

Texas, like all border states, faces particularized issues with smuggling across the southern border, be it drugs, other illegal contraband, or people. "Along the 1,200 miles of the Rio Grande forming the border between Texas and Mexico . . . drug cartels have made an incredibly lucrative enterprise out of trafficking humans and illegal drugs like

---

preemption by simply not referencing immigration law:

> So Kansas . . . will never make that mistake again, Mr. Hughes . . . . And in every future case [they will use different wording that does not reference immigration law]. And that will be the end of that . . . . [I]t's not preempted and none of these cases will ever be preempted again after today . . . . [When bringing cases in the future,] Kansas will use a different set of magical words and that will be the end of this problem[.]"

Oral Argument at 42:04–42:37, *Kansas v. Garcia*, 589 U.S. 191 (2020) (No. 17-834), https://www.oyez.org/cases/2019/17-834.

fentanyl, which is frequently encountered in vast quantities at the border." *Texas v. U.S. Dep't of Homeland Sec.*, No. 23-50869, 2024 WL 4903376, at *2 (5th Cir. Nov. 27, 2024) (cleaned up). United States Border Patrol interviews "indicate that 80–95 percent of unlawful border crossers hired a smuggler in recent years, a pattern partly driven by transnational criminal organizations' . . . control of crossing points along the Mexican side of the border." U.S. DEP'T HOMELAND SEC., BORDER SECURITY METRICS REPORT: 2022 (2023), 67. In addition to fees as high as $12,000 for smuggling to a final destination, smugglers have been forcing unlawful crossers to "participate in smuggling controlled substances or other illicit items across the border or to work off debts upon arrival in the United States" as "alternative forms of payment." *Id*. at 68.

Smuggling affects more than just the individuals directly involved. Smuggling can impact landowners whose lands are traversed; communities through which smugglers pass and in which contraband is distributed; law enforcement officers who encounter smugglers, often unexpectedly after traffic stops; as well as local, state, and national criminal justice officials and courts. *See State v. Flores*, 679 S.W.3d 232, 241 (Tex. App.—San Antonio 2023, pet. ref'd) (relaying testimony from Duval County investigator). But in the case of human smuggling, it is the smuggled persons who are the direct victims. Human smuggling includes not only undocumented noncitizens, but "people in forced servitude, unaccompanied children, and those in prostitution rings." *See State v. Burciaga*, No. 08-23-00034-CR, 2024 WL 3917196, at *11 (Tex. App.—El Paso Aug. 23, 2024, pet. filed) (mem. op., not designated for publication) (Alley, C.J., concurring) (discussing testimony from Texas Department of Public Safety supervisor). Smuggled persons can face "assault, ransom, rape, murder, abandonment, and trafficking" at the

8

hands of human smugglers, *Flores*, 679 S.W.3d at 241, and torture and death at the hands of human smugglers are recurring occurrences. *See* Miriam Jordon, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. TIMES (July 25, 2022), https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html (describing 2014 "house of horrors" in Carrizo Springs, Texas where hundreds of undocumented noncitizens had been held for ransom, raped, and tortured; the 2022 deaths of 53 undocumented noncitizens packed in a "suffocating tractor-trailer" in San Antonio, Texas; and rescues of undocumented noncitizens from unventilated cargo containers and stash houses where they were "being held against their will").

Texas has not been blind to the plight of victims of human smuggling within its borders or to the need to protect its general populace and communities affected by the dangerous crime of human smuggling. One response was the enactment of penal code § 20.05(a)(1)(A) that addresses the offense of human smuggling, providing that:

(a) A person commits an offense if the person knowingly:

    (1) uses a motor vehicle, aircraft, watercraft, or other means of conveyance to transport an individual with the intent to:

        (A) conceal the individual from a police officer or special investigator[.]

TEX. PENAL CODE ANN. § 20.05(a)(1)(A). As acknowledged by the majority opinion, § 20.05(a)(1)(A) is neutral on its face and does not require any reference or determination of immigration status for conviction. Nor does the subsection at issue refer to or rely on any aspect of immigration law.

Nevertheless, the majority opinion would exclude undocumented noncitizens victims from the protection of § 20.05(a)(1)(A)—at least when a prosecutorial "immigration

9

motive" is demonstrated by the record—under the theory that § 20.05(a)(1)(A) is impliedly field- and conflict-preempted by federal immigration law when the smuggling victims are undocumented noncitizens.

The majority opinion misses the mark, both by treating § 20.05(a)(1)(A), a clear exercise of Texas's police powers, as if it were a regulation of immigration, and by failing to properly analyze the federal statutes on which the majority opinion bases its theories of preemption. The majority opinion primarily relies on three federal circuit court of appeals cases—*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250 (11th Cir. 2012) (*GLAHR*); *United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013)—and one Colorado Supreme Court case—*Fuentes-Espinoza v. People*, 408 P.3d 445 (Colo. 2017)—none of which are binding on Texas courts and all of which dealt with facial challenges to human smuggling statutes markedly different from § 20.05(a)(1)(A). The majority opinion also significantly relies on the dissenting opinion in *Burciaga*, 2024 WL 3917196, at *18–28 (Soto, J., dissenting), a case in which the as-applied challenge to § 20.05(a)(1)(A) was not reached by the majority.

I disagree with both the majority opinion's reliance and analysis. Review of the relied-on non-Texas cases reveals that they fail to properly analyze the federal statutes at issue or consider evidence of Congress's intent that states would be prosecuting state offenses in which undocumented noncitizens would be smuggled victims. Moreover, the majority opinion's reliance on the non-Texas cases is misplaced given the differences in the statutes at issue in those cases and the one before us. Similarly, the dissent in *Burciaga* relied on by the majority opinion fails to properly analyze the relevant federal

10

statutes and fails to properly define the relevant fields, as pointed out by the concurrence in *Burciaga*. *See Burciaga,* 2024 WL 3917196, at *11–17 (Alley, C.J., concurring). Finally, the majority opinion fails to properly consider and apply binding United States Supreme Court precedent.

C.

1.

While under the Supremacy Clause, U.S. CONST. art. VI, cl. 2, Congress may enact legislation that preempts state laws, this is an "extraordinary power in a federalist system" that courts "must assume Congress does not exercise lightly." *Gregory*, 501 U.S. at 460. The "two cornerstones of our pre-emption jurisprudence" are that (1) Congress's purpose "is the ultimate touchstone," and (2) "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996)).

The clearest expression of Congressional intent to preempt state law is express preemption in which Congress "withdraw[s] specified powers from the States by enacting a statute containing an express presumption provision." *Arizona v. United States*, 567 U.S. 387, 399 (2012). The majority opinion does not assert, nor did Gutierrez argue below, that Congress explicitly prohibited the States from enacting state laws regarding human smuggling that could be applied when undocumented noncitizens were the smuggled victims.

11

Rather, Gutierrez and the majority opinion rely on implied preemption. A state statute may be impliedly preempted by federal law under either field preemption or conflict preemption.

Under field preemption, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id*. "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id*. (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Under conflict preemption, state laws are preempted (1) when "compliance with both federal and state regulations is a physical impossibility," and (2) "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 567 U.S. at 399–400 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). But reviewing courts may not conduct "a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives" as this would "undercut the principle that it is Congress rather than the courts that pre-empts state law." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992)). Rather, like all preemption inquiries, conflict preemption must be rooted in the law actually enacted by Congress.

In analyzing whether § 20.05(a)(1)(A) is impliedly preempted by federal law, we must begin by analyzing the federal statute that allegedly takes precedence over the state

12

statute. *Kansas v. Garcia*, 589 U.S. 191, 202 (2020). This is because "'[t]here is no federal preemption *in vacuo*,' without a congressional text, federal statute, or treaty made under the authority of the United States." *Id*. (quoting *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)). "[T]he Supremacy Clause [cannot] be deployed . . . to elevate abstract and unenacted legislative desires above state law; only federal laws 'made in pursuance of' the Constitution, through its prescribed processes of bicameralism and presentment, are entitled to preemptive effect." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (plurality op.) (quoting U.S. CONST. art. VI, cl. 2). "So any '[e]vidence of pre-emptive purpose,' whether expressed or implied, must therefore be 'sought in the text and structure of the [federal] statute at issue.'" *Id*. (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). Accordingly, we analyze an implied preemption contention "much as we would any other [contention] about statutory meaning, looking to the text and context of the law in question and guided by the traditional tools of statutory interpretation." *Id*. at 767.

2.

Any preemption analysis of § 20.05(a)(1)(A) must begin with the presumption against preemption. *See Wyeth*, 555 U.S. at 565. The majority opinion declines to apply the presumption against preemption to its review of § 20.05(a)(1)(A), citing to *South Carolina*, 720 F.3d at 529 ("This Court has declined to apply the presumption against preemption when dealing with a state law that 'regulates in an area with authorized federal presence' . . . . We further decline to apply the presumption to state laws that concern immigration, an area with extensive federal presence." (citations omitted)), and *United States v. Locke*, 529 U.S. 89, 108 (2000) (holding that presumption is only triggered when

13

field preempted has been traditionally occupied by the States, not when the States regulate in a field with a history of significant federal presence). But the majority opinion mischaracterizes § 20.05(a)(1)(A) and so misapplies both cases.

*South Carolina* expressly limits its holding to "this Court" (i.e., the Fourth Circuit) and moreover involved state legislation whose language expressly required the state to make determinations about federal immigration law, lending support to the Fourth Circuit's determination that its statute was one involving immigration and regulating in an area traditionally the sphere of the federal government. *See South Carolina*, 720 F.3d at 522–23, nn.1–4 (setting out statutes relating to a person who "has come to, entered, or remained in the United States in violation of law," requiring accused to act with intent to further the "person's unlawful entry into the United States or avoiding apprehension or detection of that person's unlawful immigration status," and dealing with "certificate of alien registration or alien registration receipt card" and false identification "for the purpose of offering proof of the person's lawful presence in the United States").

Likewise, in *Locke*, the United States Supreme Court reviewed regulations adopted by the state of Washington "governing tanker operations and design," some of which the court found were not part of the State's police powers as they "b[ore] upon national and international maritime commerce," a field that Congress has legislated in "from the earliest days of the Republic." 529 U.S. at 94, 108.

But in the instant case, the presumption against preemption does apply because in enacting penal code § 20.05(a)(1)(A), Texas legislated in an area traditionally occupied by the states—criminal law enforcement. "From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true

14

today." *Garcia*, 589 U.S. at 212. Unlike the South Carolina or Washington statutes, *not a single word* of § 20.05(a)(1)(A) intrudes into an area of traditional federal dominance. Rather, it plainly and simply prohibits using a means of conveyance to transport "an individual with the intent to conceal the individual from a police officer or special investigator." TEX. PENAL CODE ANN. § 20.05(a)(1)(A). While the majority opinion treats § 20.05(a)(1)(A) as if it were a regulation of immigration and not entitled to a presumption against preemption, such characterization cannot hold in the face of the text of the actual statute. Section 20.05(a)(1)(A) regulates the criminal conduct of smuggling any "individual," regardless of immigration status, and therefore the presumption against preemption applies.

Accordingly, in order for § 20.05(a)(1)(A) to be federally preempted, it must be established—by reference to the texts of the federal laws that are said to preempt it—that it was the clear and manifest intent of Congress to overcome the presumption against preemption and to displace state penal laws criminalizing smuggling of "an individual" in instances when the individual smuggled turns out to be an undocumented noncitizen.

3.

a.

The first task in a field preemption analysis is to define the relevant field from which Congress has allegedly ousted State regulation, *Garcia*, 589 U.S. at 208, and its boundaries. *DeCanas v. Bica*, 424 U.S. 351, 360 n.8 (1976) ("Every Act of Congress occupies some field, but we must know the boundaries of that field before we can say that it has precluded a state from the exercise of any power reserved to it by the Constitution.") (quoting *Hines*, 312 U.S. at 78 (Stone, J., dissenting)). "To discover the

15

boundaries[,] we look to the federal statute itself, read in the light of its constitutional setting and its legislative history." *Id*. (quoting *Hines*, 312 U.S. at 78–79). But even the occupation of a particular field by the federal government does not mean that a state may not legislate in that field. "Only a demonstration that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress would justify that conclusion." *Id*. at 357 (cleaned up). The United States Supreme Court has been reluctant to find such an intent on the part of Congress and only in "rare cases" has it "found that Congress 'legislated so comprehensively' in a particular field that it left 'no room for supplementary state legislation.'" *Garcia*, 589 U.S. at 208 (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)).

The majority opinion holds that "transportation and concealment from law enforcement of undocumented noncitizens . . . . is a field which is governed by a 'pervasive' federal statutory framework and in which there is a 'dominant' federal interest, thereby precluding even complementary state regulation." *Ante*, at 16–17. The majority opinion also states its agreement "with the apparently unanimous view of courts nationwide, that by enacting and amending the INA [Immigration and Naturalization Act], Congress's purpose was to create a 'comprehensive framework' governing not only unauthorized immigration itself, but also 'the transportation, concealment, and inducement of unlawfully present [undocumented noncitizens].'" *Ante*, at 11 (first citing to *GLAHR*, 691 F.3d at 1263; then citing *Valle del Sol, Inc.*, 732 F.3d at 1024–25; then citing *South Carolina*, 720 F.3d at 531; *Fuentes-Espinoza*, 408 P.3d at 452; and then citing *Burciaga*, 2024 WL 3917196, at *26 (Soto, J., dissenting)).

16

But this viewpoint is not so universally held. At least one federal circuit court and two state appellate courts have held otherwise, and a concurrence counters the dissent the majority relies on in *Burciaga*. *See Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013) (rejecting argument that 8 U.S.C. § 1324(a)(1)(A)(iii) precluded state anti-harboring law directed at undocumented noncitizens); *In re Jose C.*, 198 P.3d 1087, 1099 (Cal. 2009) ("We discern no intent by Congress, in either its initial enactment or subsequent amendments of the Immigration and Nationality Act (INA) (8 U.S.C. §§ 1101-1537), to occupy the field of immigration law generally or [undocumented noncitizen] smuggling in particular."); *State v. Flores*, 188 P.3d 706, 412 (Ariz. Ct. App. 2008) ("There is no indication in the INA or its history that Congress intended to preclude harmonious state regulation touching on the smuggling of [undocumented noncitizens] in particular."); *see also Burciaga*, 2024 WL 3917196, at *11–17 (Alley, C.J., concurring).

Most significantly, the United States Supreme Court has never held that Congress has field preempted state law regarding the "transportation and concealment from law enforcement of undocumented noncitizens." The majority opinion quotes *Arizona* for the proposition that "[f]ederal governance of immigration and alien status is extensive and complex," but *Arizona* only found field preemption in the narrow field of alien registration. *See Arizona*, 567 U.S. at 395, 402. *Arizona*'s other holdings finding preemption were all decided under conflict preemption. *Id*. at 406, 410. *Arizona* cannot be relied upon to support field preemption beyond the narrow scope of alien registration.

b.

I find the analysis and reasoning in the cases on which the majority opinion relies unpersuasive and inapplicable to the question before us. The principal holding on field

17

preemption in *GLAHR*, which is shared by *South Carolina*, *Valle del Sol, Inc.*, and *Fuentes-Espinoza*, is that the "INA provides a 'comprehensive framework' to penalize the 'transportation, concealment, and inducement of unlawfully present [undocumented noncitizens]'" in the various subsections of 8 U.S.C. § 1324, supported by 8 U.S.C. § 1329 and the placement of 8 U.S.C. § 1324 among other federal statutes "criminalizing the acts undertaken by [undocumented noncitizens] and those who assist them in coming to, or remaining within the United States . . . . [which] illustrates an overwhelming dominant federal interest in the field." *GLAHR*, 691 F.3d at 1263–64; *see South Carolina*, 720 F.3d at 530–31; *Valle del Sol, Inc.*, 732 F.3d at 1024–26; *Fuentes-Espinoza*, 408 P.3d at 451–52. *GLAHR* further described Congress as having "provided a 'full set of standards' to govern the unlawful transport and movement of [undocumented noncitizens]." *GLAHR*, 691 F.3d at 1264.

But a close examination of 8 U.S.C. § 1324 reveals that nothing in the language of that statute demonstrates a "clear and manifest purpose" that states may not regulate in the area of the "transportation [and] concealment[ [8] ] . . . of unlawfully present [undocumented noncitizens]," i.e., smuggling of undocumented noncitizens.

That Congress knows how to expressly make a statute preemptive is obvious in the very next section, 8 U.S.C. § 1324a ("Unlawful employment of aliens"), which includes an express preemption subsection. *See* 8 U.S.C. § 1324a(h)(2) ("The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee

---

[8] Because penal code § 20.05(a)(1)(A) only involves of transporting with the intent to conceal, the question of preemption as to inducement is not relevant to this appeal. *See* TEX. PENAL CODE ANN. § 20.05(a)(1)(A).

18

for employment, unauthorized aliens."). And yet nothing of that nature appears in 8 U.S.C. § 1324. Nor does any language referring to states appear in the statute except in subsection (c), which permits state law enforcement officials to arrest violators. 8 U.S.C. § 1324(c).

*GLAHR* cites to 8 U.S.C. § 1324(c) as proof of preemption, describing it as a federal limitation on what states are allowed to do in this area. *See GHLAR*, 691 F.3d at 1263–64 ("Rather than authorizing states to prosecute for these crimes, Congress chose to allow state officials to arrest for [8 U.S.C.] § 1324 crimes, subject to federal prosecution in federal court."). But 8 U.S.C. § 1324(c) does no such thing. That subsection *expands* the groups of officers that may make arrests for this violation of federal law, ensuring that state officers can cooperate in the prosecution of this federal statute through arrest power. The fact that a state officer has the authority to arrest violators of this federal offense and so work cooperatively with federal authorities on prosecutions of this federal offense, says nothing about whether a state is prohibited from enacting a state offense for similar or related behavior.

*GLAHR*'s reliance on 8 U.S.C. § 1329 for its related argument that—since the prosecution of 8 U.S.C. § 1324 was restricted to federal courts, states must be impliedly preempted from enacting state laws involving similar or related conduct—is likewise misplaced. 8 U.S.C. § 1329 merely provides that federal district courts will have jurisdiction over immigration-related penalties enacted in Subchapter VIII of Section 8 (General Penalty Provisions). 8 U.S.C. § 1329. This is a readily understandable clarification of jurisdiction as the adjudication of legal issues in other subchapters of 8 U.S.C. are handled by federal immigration judges, not federal district judges. *See*, *e.g.*,

8 U.S.C § 1229a(a)(1) ("An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien."); 8 C.F.R. § 1003.10(a), (b) (setting out authority of immigration judges "to conduct specified classes of proceedings, including hearings under section 240 of the Act . . . . and such other proceedings the Attorney General may assign to them"); 8 C.F.R. § 1003.14(d) (describing jurisdiction of immigration judges to include "exclusion, deportation and removal, rescission, and asylum-only, and other proceedings"). Eight U.S.C. § 1329 in no way speaks to the preemption of state courts enforcing state laws that may cover similar or related conduct. In fact, as this provision gives federal district courts jurisdiction over all causes brought by the United States "under the provisions of this subchapter," it would apply to 8 U.S.C. § 1324a as well. But, as discussed *supra*, 8 U.S.C. § 1324a does not field preempt all state legislation. *GLAHR*'s conclusion that 8 U.S.C. § 1329 buttresses its holding of 8 U.S.C. § 1324 field preemption is unsupported.

*GLAHR* and the related authorities on which the majority opinion relies also make much of the fact that 8 U.S.C. § 1324 has various subparts that describe different kinds of offenses, different levels of punishment, evidentiary considerations, and the creation of an outreach program. *See GLAHR*, 691 F.3d at 1263–64; *South Carolina*, 720 F.3d at 530–31; *Valle de Sol, Inc.*, 732 F.3d at 1024; *Fuentes-Espinoza*, 408 P.3d at 452. *GLAHR* concludes that such detail creates a "comprehensive framework to penalize" the smuggling of undocumented noncitizens such that "a state's attempt to intrude into this area is prohibited." *GLAHR*, 691 F.3d at 1263–64.

But detailed federal statutes are more the norm than the exception. It is entirely unsurprising that when dealing with a complicated issue that evolves over time, Congress

20

will amend statutes and they will get longer and more detailed. *See DeCanas*, 424 U.S. at 359–60 ("Given the complexity of the matter addressed by Congress . . ., a detailed statutory scheme was both likely and appropriate, completely apart from any questions of pre-emptive intent." (quoting *N.Y. Dep't of Social Servs. v. Dublino*, 413 U.S. 405, 415 (1973))). The length and detail of a single statute alone cannot create a "federal framework of regulation 'so pervasive' . . . or a "federal interest . . . so dominant," *see Rice*, 331 U.S. at 230, as to entirely oust states from the field regulated by that statute. This is evident, again, by looking at 8 U.S.C. § 1324's neighbor statute— 8 U.S.C. § 1324a, dealing with criminal offenses for alien employment—which is three times the length of 8 U.S.C. § 1324 and even more detailed. Yet such detail and length did not itself establish preemptive intent as is clear from the insertion of an express preemption subsection in the statute and by the United States Supreme Court's holding in *Garcia*, which rejected the argument that certain state statutes were preempted by 8 U.S.C. § 1324a, either expressly or by implication under a field preemption theory. *See Garcia*, 589 U.S. at 204–10. As observed by the *Keller* court:

> We find nothing in an anti-harboring prohibition contained in one sub-part of 8 U.S.C. § 1324 [referring to § 1324(a)(1)(A)(iii)] that establishes a 'framework of regulation so pervasive . . . that Congress left no room for the States to supplement it," or evinces "a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.

*Keller*, 719 F.3d at 943.

Finally, the fact that 8 U.S.C. § 1324 appears in a subsection of Section 8 that involves other immigration-related crimes (General Penalty Provisions) does not demonstrate that the federal government has preempted states from enacting any statutes dealing with criminal behavior that may be in some way related to undocumented

21

noncitizens. As noted, *supra*, the United States Supreme Court has held to the contrary regarding another statute that appears in this same subsection—8 U.S.C. § 1324a. That Congress has made certain conduct related to undocumented noncitizens federal crimes does not automatically preempt a State from enacting state laws that also relate to such conduct or might in some way impact undocumented noncitizens.

In fact, in at least one related area—human trafficking—federal law presumes state prosecution of crimes involving undocumented noncitizens under state law as demonstrated by the enactment of federal laws that assist states in state prosecutions. *See Flores*, 679 S.W.3d at 245, n.10 (setting out various federal laws providing visas for trafficking and crime victims, providing authority for certain trafficking victims to remain in the country to assist with investigation and prosecution of traffickers, and providing that the federal government develop and distribute materials to aid states in state trafficking prosecutions). If 8 U.S.C. § 1324 preempted all state prosecutions in which undocumented noncitizens are transported, there would be no need for such federal laws.

c.

Nevertheless, to the extent that 8 U.S.C. § 1324 could be held to preempt any state legislation regarding the smuggling of undocumented noncitizens, it could only do so within the limits of its own boundaries as set out in the text of the relevant subsections. That text makes it an offense for a person to:

    (ii)    knowing or in reckless disregard of the fact *that an alien has come to, entered, or remains in the United States in violation of law*, transport[ ], or move[ ], or attempt[ ] to transport or move *such alien* within the United States by means of transportation or otherwise, *in furtherance of such violation of law*; or

    (iii)    knowing or in reckless disregard of the fact *that an alien has come to, entered, or remains in the United States in violation of law*,

22

> conceal[ ], harbor[ ], or shield[ ] from detection or attempt[ ] to conceal, harbor, or shield from detection *such alien* in any place, including any building or any means of transportation.

8 U.S.C. § 1324(a)(1)(A)(ii), (iii) (emphasis added).

Comparing the language of 8 U.S.C. § 1324(ii) and (iii) with the statutes struck down in *GLAHR*, *Valle del Sol, Inc.*, *South Carolina*, and *Fuentes-Espinoza* readily illustrates how those state statutes fell squarely within the same field as 8 U.S.C. § 1324 and involved express attempts to regulate some aspect of federal immigration law applicable to the smuggled person or required state officials to make determinations about federal immigration law applicable to the smuggled person. The smuggling statutes at issue in *GLAHR* provided, in relevant part:

> § 16-11-200  Transporting or moving illegal aliens; penalties
>
> (a)  As used in this Code section, the term: (1) *"Illegal alien" means a person who is verified by the federal government to be present in the United States in violation of federal immigration law.* . . .
>
> (b)  A person who, while committing another criminal offense, knowingly and intentionally transports or moves *an illegal alien in a motor vehicle for the purpose of furthering the illegal presence of the alien in the United States* shall be guilty of the offense of transporting of moving an *illegal alien*.
>
> . . . .
>
> § 16-11-201  Concealing, harboring, or shielding an illegal alien from detection; penalties
>
> (a)  As used in this Code section, the term: . . . (2) *"Illegal alien" means a person who is verified by the federal government to be present in the United States in violation of federal immigration law*.
>
> (b)  A person who is acting in violation of another criminal offense and who knowingly conceals, harbors, or shields *an illegal alien* from detection in any place in this state, including any building or means of transportation, *when such person knows that the person being concealed, harbored, or shielded is an illegal alien*, shall be guilty of the offense of concealing or harboring *an illegal alien*.

GA. CODE ANN. §§ 16-11-200,16-11-201 (emphasis added). Similarly, the statute at issue in *Valle del Sol, Inc.* read, in relevant part:

> § 13-2929    <u>Unlawful transporting, moving, concealing, harboring or shielding of unlawful aliens; vehicle impoundment; exception; classification</u>
>
> A.    It is unlawful for a person who is in violation of a criminal offense to:
>
> 1. Transport or move or attempt to transport or move *an alien* in this state, in furtherance of the illegal presence of *the alien* in the United States, in a means of transportation if the *person knows or recklessly disregards the fact that the alien has come to, has entered or remains in the United States in violation of law*.
>
> 2. Conceal, harbor or shield or attempt to conceal, harbor or shield *an alien* from detection in any place in this state, including any building or any means of transportation, *if the person knows or recklessly disregards the fact that the alien has come to, has entered or remains in the United States in violation of law*.

*Valle del Sol, Inc.*, 732 F.3d at 1012–13 (emphasis added) (setting out text of then-existing version of ARIZ. REV. STAT. § 13-2929). Likewise, the undocumented noncitizen smuggling statute at issue in *South Carolina* included provisions that made it a felony for a person to:

> (B)    . . . knowingly or in reckless disregard *of the fact that another person has come to, entered, or remained in the United States in violation of law* to transport, move, or attempt to transport that person . . . with intent to further that person's *unlawful entry into the United States* or avoiding apprehension or detection of that person's *unlawful immigration status* by state or federal authorities.
>
> . . . .
>
> (D)    . . . knowingly or in reckless disregard *of the fact that another person has come to, entered, or remained in the United States in violation of law* to conceal, harbor, or shelter from detection . . . that person in any place, including a building or means of transportation, with intent to further that person's *unlawful entry into the United States* or avoiding apprehension or detection of that person's *unlawful immigration status* by state or federal authorities.

S.C. CODE ANN. § 16-9-460 (emphasis added). Finally, the Colorado statute at issue in *Fuentes-Espinoza* made it a felony "if, *for the purpose of assisting another person to enter, remain in, or travel through the United States or the state of Colorado in violation of immigration laws*, he or she provides or agrees to provide transportation to that person in exchange for money or any other thing of value." *Fuentes-Espinoza*, 408 P.3d at 447 (emphasis added) (setting out former COLO. REV. STAT. ANN. § 18-13-128 (repealed)).

By contrast, the portion of Texas's human smuggling statute at issue in this case reads:

(a) A person commits an offense if the person knowingly:

    (1) uses a motor vehicle, aircraft, watercraft, or other means of conveyance to transport an individual with the intent to:

        (A) conceal the individual from a police officer or special investigator[.]

TEX. PENAL CODE ANN. § 20.05(a)(1)(A).

d.

Thus even if Congress, through the enactment of 8 U.S.C. § 1324, intended to preempt states from enacting laws that regulate in the field of "transportation [and] concealment . . . of unlawfully present [undocumented noncitizens]," *GLAHR*, 691 F.3d at 1263, by "criminaliz[ing] the smuggling of [undocumented] noncitizens," *Flores*, 679 S.W.3d at 246, that intent would not preempt Texas's § 20.05(a)(1)(A), which does not do so. Given its neutral language and general application to all smuggling of people, § 20.05(a)(1)(A) would not fall within the boundaries of any field preemption by 8 U.S.C. § 1324, which only applies to the criminal smuggling of undocumented noncitizens.

25

As noted *supra*, unlike § 20.05(a)(1)(A), the statutes at issue in *GLAHR*, *Valle del Sol, Inc.*, *South Carolina*, and *Fuentes-Espinoza* all expressly utilized statutory language that "directly criminalize the smuggling of [undocumented] noncitizens." *Flores*, 679 S.W.3d at 246. Accordingly, those cases are inapplicable to the question before us today. Decisions on whether other states' statutes (which explicitly include federal immigration law or immigration status in their text and an element of the offense) are preempted by 8 U.S.C. § 1324 (which expressly regulates the smuggling of undocumented noncitizens), provide no applicable guidance on whether Congress has expressed the clear and manifest purpose to preempt Texas from enacting § 20.05(a)(1)(A)—a neutral criminal statute that does not reference or rely on federal immigration law or immigration status in any way. *See* TEX. PENAL CODE ANN. § 20.05(a)(1)(A); *see also Burciaga*, 2024 WL 3917196, at *17 (Alley, C.J., dissenting) ("And even if those cases correctly decided the challenges to other state[s'] laws, their application fails here. Section 20.05(a)(1)([A]) does not require as an element of the offense that the person being smuggled is an [undocumented noncitizen].").

Unlike the statutes at issue in the cases relied upon by the majority opinion, § 20.05(a)(1)(A) contains no language attempting to regulate the field of undocumented noncitizen smuggling. It applies to undocumented noncitizens only in the way that all of Texas's criminal statutes would apply to anyone in Texas—they could potentially be victims or violators. Moreover, the fact that a state law applies to undocumented noncitizens "does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas*, 424 U.S. at 355. The United States

26

Supreme Court "has never held that every state enactment which in any way deals with [undocumented noncitizens]" is preempted by federal law. *Id*. Federal preemption should not be presumed simply because a state law applies to an undocumented noncitizen, especially when such laws are of general application. *Capron v. Att'y Gen. of Mass.*, 944 F.3d 9, 25 (1st Cir. 2019). In this case, without any reference to federal immigration law or undocumented noncitizens or immigration status in its text or as an element of the offense of human smuggling, § 20.05(a)(1)(A) simply does not fall within the boundaries of any field preemption based on 8 U.S.C. § 1324.

The Fourth Court of Appeals, whose precedent we are bound to follow in this transferred case, [9] has already answered the question of field preemption of § 20.05(a)(1)(A) before us even though it did so in a case involving a facial challenge to the statute. The *Flores* court, after reviewing the language of the statute, observed that § 20.05(a)(1)(A) is "not directly analogous to any federal statute." *Flores*, 679 S.W.3d at 245. Rather, § 20.05(a)(1)(A), with its neutral language, allows for the "prosecution of criminal traffickers who prey on vulnerable persons—citizens or not—which[ ] . . . is a legitimate realm of state criminal law." *Id.* The *Flores* court specifically distinguished § 20.05(a)(1)(A) with its neutral language from penal code § 20.05(a)(2), which makes it an offense for a person to knowingly "encourage[ ] a person to enter or remain in this country in violation of federal law by concealing, harboring, or shielding that person from detection,"[10] and held that "[a]lthough there is overlap between the federal scheme and some applications of section 20.05(a)(1)(A), we do not agree that the clear and manifest

---

[9] *See* TEX. R. APP. P. 41.3.

[10] TEX. PENAL CODE ANN. § 20.05(a)(2).

purpose of Congress was to bar state liability for the smuggling of persons." *Id*. The *Flores* court concluded that "despite the state legislative history and Congress's possible intent to preempt state criminal statutes that directly criminalize the smuggling of [undocumented] noncitizens, Congress did not intend to preempt neutral state smuggling statutes like [§] 20.05(a)(1)(A)." *Id*. at 246.

I agree with the *Flores* court. Section 20.05(a)(1)(A) is not field preempted.

e.

But, one might argue, if Congress did not express the "clear and manifest purpose" to preempt Texas from *enacting* § 20.05(a)(1)(A) as written, as determined by the *Flores* court in a facial challenge, could § 20.05(a)(1)(A) be field preempted "as applied" in this case under the theory that Congress has expressed the "clear and manifest purpose" to preempt Texas from *enforcing* § 20.05(a)(1)(A) when smuggling victims are undocumented noncitizens? That is, has Congress expressed the "clear and manifest purpose" to preempt states from *enforcing a neutral criminal law*, if it involves (1) undocumented noncitizens as victims, and (2) the transportation, concealing, harboring, etc., of such victims? I say no, both because such a theory would stretch field preemption beyond its jurisprudential boundaries and because there is no support in federal law for such a holding.

Field preemption, by its nature, completely ousts states from regulating in a field preempted by Congress. It follows, then, that if a state statute's enactment is not itself field preempted, that same statute's enforcement cannot be field preempted because the state is only enforcing a statute enacted in a non-preempted field. That is what we have here. Section 20.05(a)(1)(A) was enacted as a neutral criminal statute and is not field

28

preempted by federal law, as recognized by the *Flores* court. *See Flores*, 679 S.W.3d at 245. Accordingly, § 20.05(a)(1)(A)'s enforcement is likewise not field preempted.[11]

It is also taking field preemption too far afield to tie preemption of § 20.05(a)(1)(A) to the notion of a general intent of the federal government to maintain prosecutorial control over the crimes associated with the movement of undocumented noncitizens. This would be to untether preemption from the text of a particular preempting federal statute, which we may not do. *See Garcia,* 589 U.S. at 202; *Va. Uranium, Inc.*, 587 U.S. at 767 ("Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." (quoting *Isla Petroleum Corp.*, 485 U.S. at 503)).

As discussed *supra*, 8 U.S.C. § 1324 does not do so, and any federal preemption arising from 8 U.S.C. § 1324 does not extend to a state statute in which immigration status is not an element. And there is no textual support for an implied preemption of the enforcement of every state neutral criminal statute involving the movement or concealment of the victims when the victims are undocumented noncitizens. There is simply no federal statute that preempts states from enforcing neutral criminal law statutes involving the movement or concealment of the victims, such as kidnapping, aggravated kidnapping, unlawful restraint, trafficking of persons and continuous trafficking of persons, and even capital murder when a kidnapping is involved, if the victim were an undocumented noncitizen. *See, e.g.*, TEX. PENAL CODE ANN. §§ 20.01(1)–(2) (definitions

---

[11] Of course, the enforcement of a non-field preempted statute may nevertheless be preempted if it conflicts with federal law, but that would be a question of conflict preemption, not field preemption.

29

of "restrain" and "abduct"), 20.02(a) (Unlawful Restraint), 20.03(a) (Kidnapping), 20.04(a),(b) (Aggravated Kidnapping), 20A.01(4) (definition of "traffic"), 20A.02(a) (Trafficking of Persons), 20A.03(a) (Continuous Trafficking of Persons), and 19.03(a)(2) (capital murder in the course of committing or attempting to commit kidnapping).

For federal preemption purposes, it is simply not enough for a state statute to involve the movement or concealment of the victim and for the victim to be an undocumented noncitizen. Whether or not 8 U.S.C. § 1324 field preempts state statutes that "directly criminalize the smuggling of [undocumented] noncitizens," *see Flores*, 679 S.W.3d at 246, such as by the inclusion of language requiring knowledge of the unauthorized immigration status of the smuggled person or the intent to further the smuggled person's illegal presence in the United States in violation of federal law, is not before us. That is simply not this statute. Under § 20.05(a)(1)(A), the state of Texas does not "directly criminalize the smuggling of [undocumented] noncitizens" and does not regulate the smuggling of noncitizens. As the majority opinion acknowledges, proof of the immigration status of the victims is unnecessary to a conviction under § 20.05(a)(1)(A). Rather than a regulation of the smuggling of noncitizens in an effort to enforce or supplant federal law, § 20.05(a)(1)(A) is a penal statute of general applicability that prevents and protects all victims of smuggling in Texas, regardless of nationality. Under the majority opinion's holding, undocumented noncitizen victims, who are likely to be among the most vulnerable of smuggling victims in Texas, would alone be left unprotected. I find no support for the contention that Congress clearly and manifestly intended to oust the states from enacting or enforcing neutral criminal law provisions for crimes whose elements involve movement or concealment of the victims, when the victims of such crimes are

undocumented noncitizens. I would hold that § 20.05(a)(1)(A) is not field preempted.

4.

The majority opinion also holds that § 20.05(a)(1)(A) is preempted because it conflicts with the "purposes and objectives"[12] of 8 U.S.C. § 1324. I disagree.

In support of its holding, the majority opinion notes that 8 U.S.C. § 1324 includes punishment schemes and evidentiary standards that differ from those found in § 20.05(a)(1)(A). *See* 8 U.S.C. § 1324(a)(1)(A)(ii), (iii), (B)(i), (d). In particular, the majority opinion notes that in order for Gutierrez to be convicted under 8 U.S.C. § 1324, federal prosecutors would have to prove that she "kn[ew]" or was "in reckless disregard of the fact" that her passengers "ha[d] come to, entered, or remain[ed] in the United States in violation of law," and, if convicted, Gutierrez would face a lower sentencing range.[13] *See* 8 U.S.C. § 1324(a)(1)(A)(ii), (iii), (B)(i). The majority opinion concludes that a state prosecution would undermine Congress's "careful calibration of punishments for the crimes proscribed," quoting *Fuentes-Espinoza*, 408 P.3d at 453.

Likewise, the dissent in *Burciaga* concludes that Congress intended to preempt state prosecution of persons found transporting or harboring undocumented noncitizen because "[t]o hold otherwise would give state prosecutors 'the ability to prosecute those who transport or harbor [undocumented noncitizens] in a manner unaligned with federal immigration enforcement priorities.'" 2024 WL 3917196, at *26 (Soto, J., dissenting). Though this comment appears in the field preemption section of the dissent, it is in the

---

[12] I share in the skepticism of Justice Clarence Thomas to the expansion of the "purposes and objectives" preemption jurisprudence, but that issue is not for this intermediate state court. *See Wyeth v. Levine*, 555 U.S. 555, 583 (2009) (Thomas, J., concurring in judgment).

[13] I note that Gutierrez's prior criminal history may impact any potential federal sentence under 8 U.S.C. § 1324.

nature of a conflict preemption argument.

Both of these analyses suffer from two fatal flaws.

The first flaw is that both fail to recognize that Texas Penal Code § 20.05(a)(1)(A) is an exercise of Texas's police powers to enact criminal laws prohibiting certain conduct in its boundaries, just as 8 U.S.C. § 1324 is an exercise of the federal government's powers to do the same. These are different criminal statutes by different sovereigns criminalizing different conduct and assigning different punishments. Contrary to the majority opinion's characterization, 8 U.S.C. § 1324 is *not* "the analogous federal statute" to § 20.05(a)(1)(A). *See Flores*, 679 S.W.3d at 245. It is a feature of our system of dual sovereignty that, in the area of criminal law, both the state and federal government may legislate, and it has long been settled that a person may be liable to punishment for the same act for both state and federal offenses. *Bartkus v. Illinois*, 359 U.S. 121, 131–32 (1959). The fact that state and federal criminal offenses may have different elements and different ranges of punishment does not create a conflict. *See id.*; *see also Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013) ("The fact that a state has more stringent regulations than a federal law does not constitute conflict preemption.").

The second and related flaw is the failure to analyze and apply the relevant holdings in the most recent United States Supreme Court decision on federal preemption in a context involving undocumented noncitizens—*Kansas v. Garcia*. *Garcia* has expressly rejected the argument that a state law is conflict preempted because state prosecution "would risk upsetting federal enforcement priorities and frustrating federal objectives, such as obtaining the cooperation of [undocumented noncitizens] in making bigger cases." *See Garcia*, 589 U.S. at 211, 212.

32

As explained by *Garcia*:

> The mere fact that state laws . . . overlap to some degree with federal criminal provisions does not even begin to make a case for conflict preemption. From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today. In recent times, the reach of federal law has expanded, and there are now many instances in which a prosecution for a particular course of conduct could be brought by either federal or state prosecutors. Our federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap, and there is no basis for inferring that federal criminal statutes preempt state laws whenever they overlap . . . . In the end, however, the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption. The Supremacy Clause gives priority to "the Laws of the United States," not the criminal law enforcement priorities or preferences of federal officers. Art. VI, cl.2.

*Id*. at 211–12. I believe this authority resolves the question before us on conflict preemption. In light of the applicable jurisprudence on the relationship between the States and federal government in the realm of criminal law, and the recent holding of *Garcia*, I would hold that § 20.05(a)(1)(A) is not conflict preempted.

III.

The majority opinion concludes by acknowledging that Texas has a "compelling interest in deterring, policing, and prosecuting the offense of human smuggling," including when the smuggled victims are undocumented noncitizens, but then faults Texas for not providing a "reason why prosecution in federal court would be inadequate to protect the interests of its citizens in this or any similar case." *Ante*, at 18. But the majority opinion cites to no authority requiring the State to make such a showing, and the imposition of such a requirement would run counter to the foundational principle of dual sovereigns which governs our Nation, particularly in the area of criminal law. *See Gregory*, 501 U.S. at 457; *Garcia*, 589 U.S. at 211–12. Texas need not wait on the federal government to

33

protect those within its boundaries from criminal actors who violate state criminal laws, nor must Texas acquiesce to whatever level of punishment that federal officials determine is appropriate for federal offenses that overlap with state criminal laws.

Texas has the right to enact and enforce § 20.05(a)(1)(A)—a neutral criminal statute applicable to all who smuggle, and all who are smuggled, regardless of nationality—to prevent criminal conduct that Texas determines should be prohibited and to punish such conduct in accordance with Texas's priorities. Section 20.05(a)(1)(A) is not federally preempted by 8 U.S.C. § 1324, which governs different criminal conduct prohibited by a different sovereign with its own punishment scheme in accord with its own priorities. I agree with the concurring opinion in *Burciaga* that "Section 20.05(a)(1)([A]) is the quintessential exercise of a State's police powers to protect its own citizens," that human smuggling should "never be tolerated," and that "Texas has every right to forbid it." *Burciaga*, 2024 WL 3917196, at *18 (Alley, C. J., concurring).

IV.

As I would hold that § 20.05(a)(1)(A) is not federally preempted and so is constitutional as applied, I would reach appellant's remaining three issues. I believe issues three and four would bear special examination in light of the recent decision by the Texas Court of Criminal Appeals in *Elsik v. State*, No. PD-0703-23, 2024 WL 4898042, at *1, *7 (Tex. Crim. App. Nov. 27, 2024), and the lack of any showing by the State in the record establishing that the witness was unavailable under Texas Rule of Evidence 804(a)(5). But a determination on those issues will have to await another day.

34

V.

For all the foregoing reasons, I respectfully dissent.

CLARISSA SILVA
Justice

Publish.
Tᴇx. R. Aᴘᴘ. P. 47.2(b)

Delivered and filed on the
16th day of December, 2024.